## John COLEMAN *v.* PRO TRANSPORTATION, INC.
## & Commerce & Industry Ins. Co.

CA 06-525 249 S.W.3d 149

### Court of Appeals of Arkansas
### Opinion delivered February 7, 2007

[Rehearing denied March 14, 2007.*]

---

* GLADWIN and VAUGHT, JJ., would grant.

*Whetstone & Spears*, by: *Kevin Mark Odum*, for appellant.

*Huckaby, Munson, Rowlett, & Moore, P.A.*, by: *Carol Lockard Worhly*, and *Jarrod S. Parrish*, for appellee.

BRIAN S. MILLER, Judge. John Coleman appeals the Arkansas Workers' Compensation Commission's-ruling (1) denying him temporary-total-disability (TTD) compensation; (2) awarding him only four-and-a-half percent anatomical-impairment rating and ten percent wage-loss disability; and (3) admitting the surveillance evidence of Pro Transportation, Inc., and Commerce & Industry Insurance Company (collectively Pro Transportation). We affirm the Commission's denial of temporary-total disability benefits and its decision regarding the admittance of the surveillance evidence. However, we reverse and remand the Commission's decisions regarding anatomical-impairment rating and wage-loss disability.

Coleman is fifty-two years of age and has a GED and two years of post-secondary education. He began working for Pro Transportation as a long-haul truck driver in 1999. The accident giving rise to this claim occurred on September 19, 2002, when the load Coleman was hauling shifted, causing his truck to overturn. Coleman was initially treated for injuries sustained in the accident in the emergency room at Baptist Medical Center. He was later treated by his family physician until he was directed by Pro Transportation to visit its designated medical provider, Dr. Scott Carle, on November 26, 2002.

Jim White, Pro Transportation's director of safety, notified Coleman in a certified letter dated November 27, 2002, that Dr. Carle had released Coleman to light duty effective November 26, 2002. The letter advised Coleman of a light-duty position open at Pro Transportation and directed him to report for his assignment on December 2, 2002. Coleman, however, failed to appear for light-duty work. He later testified that he received the certified letter and that he made an effort to go in, but could not make it because of difficulty driving. White testified that, according to the release, Coleman was still under medical care but could come back to work in some capacity.

Dr. Andrew Prychodko became Coleman's treating physician in February 2003. He diagnosed Coleman with lumbar back pain with radiculopathy, cervical strain, neck pain, and shoulder impingement. Dr. Prychodko issued an "off work" slip reflecting that Coleman was unable to work from September 19, 2002,

through March 7, 2003. Regarding the basis for the "off work" slip, Dr. Prychodko testified that Coleman was not ready to be released to "any kind of higher level of activity" at that time. Dr. Prychodko later extended the off-work date through July 3, 2003.

Dr. Prychodko testified that a functional capacity evaluation (FCE) was inappropriate as of May 23, 2003, because Coleman had begun physical therapy, which was progressing well, and because Coleman had been referred to a pain-management specialist for his lower back pain. Approximately three months later, Coleman's case manager arranged an FCE, which was performed on August 27, 2003. The results of the FCE suggested that Coleman's efforts were less than maximal and did not represent his true maximal tolerances. The evaluator concluded that Coleman had the ability to work at least at a medium level during an eight-hour work day.

In a letter dated October 8, 2003, Dr. Prychodko certified Coleman as having reached maximum medical improvement (MMI). The letter also stated that:

> [Coleman's] lumbar impairment is DRE Category II (Guides to the Evaluation of Permanent Impairment, 4th Edition, Ch 3, p 102) giving 5% to the whole person. The cervical impairment is also DRE Category II (Guides, Ch 3, p 104) at 5%. The other injuries have healed and are rated a 0%. The combined whole person impairment rating is 10%.

Dr. Jim J. Moore, a neurologist, evaluated Coleman on one occasion at the request of Pro Transportation. In his September 24, 2003, evaluation of Coleman, he found that Coleman could not return to trucking; however, Coleman could return to working activities. In a letter dated November 11, 2003, Dr. Moore agreed with Dr. Prychodko's October 8, 2003 letter. In the November 11 letter, Dr. Moore wrote: "I have also received a report from Dr. Prychodko dated 10-08-03 in which he describes suggesting an impairment rating based upon DRE Category II both cervical and lumbar at 5% each or a total of 10%. I have no quarrel with this rating."

On February 6, 2004, counsel for Pro Transportation wrote a letter to Dr. Moore stating that Dr. Moore's November 11, 2003 ten-percent impairment rating for Coleman did not address the impairment rating pursuant to Table 75 of the AMA Guides to Evaluation of Permanent Impairment, 4th Edition. In the margins of counsel's letter appear the following hand written notes:

```
5% Cx
5% L 10%
 PPD
```

These notes, along with illegible words that preceded them, were scratched through and below these notes appeared:

Table 75 AMA 4th Ed.

```
II A
 Cx 0%
 L 0%
 B Cx 4%
 L 5%
Average Cx 2%
 L 2½% PPD
 /s J. Moore M.D.
```

The record is devoid of any explanation for either the scratched through, illegible words, the scratched through notes indicating ten percent ppd, or the second set of notes indicating "Average Cx 2%, L 2 ½ % PPD." Further, nothing appearing on counsel's February 6 letter indicates that the notations made by Dr. Moore were written with any medical certainty.

In September 2004, Dr. Prychodko testified in a deposition. On direct examination, he testified that he "assigned a 5% for the lumbar and 5% for the cervical. I stand by those." He further stated that the five-percent impairment rating on the lumbar spine was based upon an annular tear. Dr. Prychodko testified that the AMA Guides assign a five-percent permanent-impairment rating for an annular tear. He testified that the five-percent impairment rating to the cervical spine was based upon "uncinate hypertrophy and muscle spasms." He said that the uncinate hypertrophy was "an objective change" and that a muscle spasm is an objective finding.

On re-direct examination, Dr. Prychodko testified that spondylosis was identified by the MRI performed on Coleman's back and therefore Category III, Section A, of the Guides applied to Coleman's case. Although he based his prior rating on Category II, Section B, he stated that Category III, Section A was a closer match. Category III, Section A provides for a permanent impairment rating of six percent. Therefore, Coleman's permanent impairment rating was six percent to the cervical spine and five percent to the lumbar spine, totaling eleven percent. He testified that Coleman also suffered from "back, neck and chest pains."

Pro Transportation terminated Coleman for abandoning his job. At the time of his injury, Coleman was earning $47,000 per year as a long-haul truck driver for Pro Transportation. After termination, he began working at Lowe's in November 2003, where he earned approximately $17,000 per year.

Coleman sought workers' compensation benefits based upon the eleven-percent permanent-impairment rating to the body as a whole; wage-loss disability based upon the reduction in his income caused by his inability to perform his previous work; additional medical care; and temporary total disability. The Administrative Law Judge (ALJ) found that the injury to Coleman's lumbar spine and cervical spine resulted in a permanent impairment of eleven percent to the body as a whole and that he had sustained a wage-loss of forty-five percent. The ALJ also ordered Pro Transportation to pay for Coleman's future medical treatment and awarded Coleman temporary-total-disability benefits for the time period beginning on September 20, 2002, and ending September 29, 2003. Finally, the ALJ ruled that a surveillance tape that Pro-Transportation sought to introduce was inadmissable because it was obtained after the discovery cut-off date.

On appeal, the Commission found that Coleman failed to prove he was entitled to temporary-total-disability compensation. The Commission found that he was entitled to only a four-and-one-half percent anatomical rating and only ten percent for wage-loss disability. The Commission overturned the ALJ's award of additional medical expenses. In doing so, it found that both Drs. Moore and Prychodko determined that Coleman reached MMI on November 11, 2003, and therefore, he was not entitled to any additional medical treatment after that date. The Commission also found that the surveillance tape was admissible.

This court reviews a decision of the Workers' Compensation Commission to determine whether there is substantial evidence to support it. *Rice v. Georgia-Pac. Corp.*, 72 Ark. App. 149, 35 S.W.3d 328 (2000). Substantial evidence is that relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Wheeler Constr. Co. v. Armstrong*, 73 Ark. App. 146, 41 S.W.3d 822 (2001). We review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings and we affirm if its findings are supported by substantial evidence. *Geo Specialty Chem., Inc. v. Clingan*, 69 Ark. App. 369, 13 S.W.3d 218 (2000). We do not review the decision of the administrative law judge but rather we determine whether

the Commission's decision upon its de novo review is supported by substantial evidence. *See, e.g., Jones v. Scheduled Skyways, Inc.,* 1 Ark. App. 44, 612 S.W.2d 333 (1981). Where the Commission denies a claim because of the claimant's failure to meet his burden of proof, the substantial-evidence standard of review requires that we affirm if its decision displays a substantial basis for the denial of relief. *Rice, supra.*

We first address Coleman's evidentiary issue. The ALJ issued a pre-hearing order on August 5, 2004, stating "All medical reports and document evidence . . . shall be identified and furnished to opposing party within seven (7) days of authorship [the date reflected on the document]. Failure to comply with this provision of the pre-hearing order shall result in the exclusion of the document(s)." Pro Transportation had surveillance conducted on Coleman from September 20, 2004, through September 24, 2004. The surveillance conducted on September 23 and 24 was after the seven-day deadline. The ALJ excluded the surveillance evidence but the Commission reversed the ALJ and admitted the evidence.

Coleman claims that the seven-day deadline was September 22, 2004, because the hearing was set for September 29, 2004. He states that the introduction of the surveillance evidence is in direct disobedience of the pre-hearing order. He also asserts that his counsel was unable to depose Pro Transportation's investigator because the evidence was not provided until the day before the hearing and that the investigator was not present at the hearing to authenticate the report or testify about the video. Coleman argues that the Commission made the ALJ's pre-hearing order worthless by reversing the ALJ's ruling and that the Commission effectively wiped out the seven-day rule.

The Commission relied on *Bryant v. Staffmark, Inc.,* 76 Ark. App. 64, 61 S.W.3d 856 (2001), in overturning the ALJ's decision to exclude the surveillance evidence. In *Bryant,* this court wrote:

> The Workers' Compensation Commission has broad discretion with reference to admission of evidence, and its decision will not be reversed absent a showing of abuse of discretion. *Brown v. Alabama Elec. Co.,* 60 Ark. App. 138, 959 S.W.2d 753 (1998). The Commission is given a great deal of latitude in evidentiary matters; specifically, Arkansas Code Annotated section 11-9-705(a) (Repl. 1997) states that the Commission "shall not be bound by technical or statutory rules of evidence or by technical or formal rules of procedure." Additionally, the Commission is directed to "conduct

the hearing in a manner as will best ascertain the rights of the parties." Ark. Code Ann. § 11-9-705(a); *Clark v. Peabody Testing Service*, 265 Ark. 489, 579 S.W.2d 360 (1979).

. . .

In our view, it is clear that the Commission should be more liberal with the admission of evidence, rather than more stringent. It is neither fair no logical to summarily disallow rebuttal testimony, nor is it appropriate to require (as stated in the pre-hearing order) that all possible rebuttal witnesses be revealed seven days prior to the hearing. Such an order is inconsistent with a large body of law that does not require notice for rebuttal witnesses. *See Parker v. State*, 268 Ark. 441, 597 S.W.2d 586 (1980) (citing *Perkins v. State*, 258 Ark. 201, 523 S.W.2d 191 (1975)).

76 Ark. App. at 69, 61 S.W.3d at 859. Coleman argues that *Bryant* can be distinguished from this case because *Bryant* dealt with rebuttal evidence and this case involves substantive evidence in Pro Transportation's case in chief.

In ruling that the surveillance evidence was admissible, the Commission also referenced Ark. Code Ann. § 11-9-705(c) in its opinion. Section 11-9-705(c)(2)(A) (Repl. 2002) provides in pertinent part:

Any party proposing to introduce medical reports or testimony of physicians at the hearing of a controverted claim shall, as a condition precedent to the right to do so, furnish to the opposing party and to the commission copies of the written reports of the physicians of their findings and opinions at least seven (7) days prior to the date of the hearing. However, if no written reports are available to a party, then the party shall, in lieu of furnishing the report, notify in writing the opposing party and the commission of the name and address of the physicians proposed to be used as witnesses at least seven (7) days prior to the hearing.

The Commission found that the statute does not apply to non-medical evidence. Coleman relies on this statute in his argument and claims that the ALJ required that *all* exhibits were to be exchanged seven days prior to the hearing.

In response to Coleman's arguments, Pro Transportation contends that section 11-9-705(c)(2)(A) deals with medical reports or testimony of physicians and not surveillance reports. It also

argues that the surveillance reports and videos at issue were not available seven days before the hearing and that the rule itself facilitates flexibility in such situations.

Arkansas Code Annotated section 11-9-705(a) states that the Commission "shall not be bound by technical or statutory rules of evidence or by technical or formal rules of procedure." Furthermore, the Commission is directed to "conduct the hearing in a manner as will best ascertain the rights of the parties." Ark. Code Ann. § 11-9-705(a). Pro Transportation further contends that the admission of the surveillance evidence serves the interest of ascertaining the rights of the parties because it is probative of the issue of Coleman's physical limitations and the credibility of his witnesses.

 Because the Commission complied with the statutory directive to conduct the hearing in a manner that would best ascertain the rights of the parties, we affirm the Commission's decision to admit the surveillance evidence. Moreover, even if the seven-day provision found in section 11-9-705(c)(2)(A) applies to non-medical surveillance evidence, as argued by Coleman, the rule does not mandate the exclusion of all such evidence. Section 11-9-705(c) provides further, in pertinent part:

> (2)(B) If the opposing party desires to cross-examine the physician, he or she should notify the party who submits a medical report to him or her as soon as practicable, in order that he or she may make every effort to have the physician present for the hearing.

> (3) A party failing to observe the requirements of this subsection may not be allowed to introduce medical reports or testimony of physicians at a hearing, except in the discretion of the hearing officer or the commission.

> (4) The time periods may be waived by the consent of the parties.

Section 11-9-705(c)(3) provides that the ALJ and the Commission have discretion in determining whether to admit or exclude this evidence, and we hold that the Commission here did not abuse its discretion in admitting the surveillance evidence.

We next address the Commission's decision regarding Coleman's claim for additional medical care. The Commission has the duty of weighing the medical evidence as it does any other

evidence. *Roberson v. Waste Mgmt.*, 58 Ark. App. 11, 944 S.W.2d 858 (1997). The Commission has the authority to accept or reject medical opinions and its resolution of the medical evidence has the force and effect of a jury verdict. *Poulan Weed Eater v. Marshall*, 79 Ark. App. 129, 84 S.W.3d 878 (2002). When the Commission denies benefits upon finding that the claimant failed to meet his burden of proof, the substantial evidence standard of review requires that we affirm if the Commission's decision displays a substantial basis for denial of the relief. *Cooper v. Hiland Dairy*, 69 Ark. App. 200, 11 S.W.3d 5 (2000). Additionally, the Commission cannot arbitrarily disregard any witness's testimony. *Freeman v. Con-Agra Frozen Foods*, 344 Ark. 296, 40 S.W.3d 760 (2001).

The Commission reversed the ALJ's ruling requiring Pro Transportation to pay all of Coleman's reasonable and necessary medical expenses from the date of the compensable injury. The Commission ruled that Coleman was not entitled to any further medical treatment after November 11, 2003. Coleman argues that additional medical care was warranted because Dr. Prychodko was the only doctor familiar with his condition and because Pro Transportation's independent medical examiner failed to say whether additional medical care was necessary.

Coleman submits that, while it is the province of the Commission to weigh conflicting medical evidence, the Commission may not arbitrarily disregard medical evidence or the testimony of any witness. Because the only medical evidence in the record about his need for additional medical care comes from Dr. Prychodko, Coleman argues that the Commission simply ignored Dr. Prychodko's testimony. Coleman claims that, based upon the facts in the record, fair-minded persons could not have reached the same conclusion as the Commission concerning his entitlement to continued medical care.

We hold that the Commission's determination regarding additional medical treatment is supported by substantial evidence. Dr. Prychodko stated only that Coleman could "possibly" need physical therapy and that there "could be a possibility" he may need lumbar epidural steroid injections at some point. The medical evidence also included the opinions of Drs. Moore and Carle, who both placed Coleman at MMI on November 11, 2003. Indeed, Dr. Prychodko later agreed with the opinions of Drs. Moore and Carle. Therefore, we find that there is substantial evidence supporting the Commission's denial of additional medical care.

Coleman also argues that he is entitled to temporary total disability (TTD) through September 29, 2003. A claimant is entitled to TTD for that period within the healing period during which he suffers a total incapacity to earn wages. *Ark. State Highway Dep't v. Breshears*, 272 Ark. 244, 613 S.W.2d 392 (1981). The ALJ found that Coleman was temporarily and totally disabled beginning on September 20, 2002, and continuing through the end of his healing period, which Dr. Prychodko determined to be September 29, 2003. The Commission reversed the ALJ because the Commission found that there was a lack of credible evidence supporting the ALJ's decision. Coleman argues that the Commission's finding is totally contrary to the medical records, which clearly indicate that all of his doctors were of the opinion that he should not work during the healing period, that ended on September 29, 2003.

■ Pro Transportation contends that the Commission's decision was supported by substantial evidence. Pro Transportation points out that Coleman was offered modified-duty employment via certified letter dated November 27, 2002, and that he never reported for work and never provided any medical justification for his refusal.

Arkansas Code Annotated section 11-9-526 (Repl. 2002) makes it clear that:

> If any injured employee refuses employment suitable to his capacity offered to or procured for him, he shall not be entitled to any compensation during the continuance of his refusal, unless in the eyes of the Workers' Compensation Commission, the refusal is justifiable.

Coleman offered no persuasive evidence or argument regarding his refusal to return to light-duty employment in November 2002. Moreover, Dr. Carle's report contains the following entry:

> Post-physical therapy encountered today, the patient was adamant upon refusing employment with restrictions. At that time, he appeared to be overtly uncooperative with recommending participation and temporary appropriate work activity. The patient's main concern was not going back to work because he would get half pay. He also stated that "my company did this to me, and I want to be back to normal before I go back to work."

Coleman was released to return to work on at least two occasions. He failed to return to work both times. Therefore, we affirm the Com-

mission's denial of temporary-total-disability compensation because it is supported by substantial evidence.

We next consider whether the Commission erred in reducing Coleman's permanent impairment rating from eleven percent to four-and-a-half percent. Coleman argues that the ALJ assigned him an eleven-percent impairment rating primarily based upon the deposition testimony of his treating physician, Dr. Prychodko, and that Dr. Moore initially agreed with this rating. Coleman asserts that, when Dr. Moore was directed by counsel for Pro Transportation by letter to rate Coleman "according to Table 75" of the AMA Guides, he simply wrote numbers in the margin of the letter which can be added to total four-and-one-half percent.

Coleman claims that nowhere in the record does Dr. Moore express his opinion of a four-and-one-half-percent permanent-impairment rating to a reasonable degree of medical certainty or otherwise. He also states that the Commission resorted to speculation and conjecture in reducing the impairment rating to four-and-one-half percent and that this is something the Commission is not allowed to do in reaching a conclusion. *See Smith-Blair, Inc. v. Jones,* 77 Ark. App. 273, 72 S.W.3d 560 (2002) (stating that speculation and conjecture cannot substitute for credible evidence).

Pro Transportation contends that Dr. Prychodko based the impairment rating of eleven percent upon improper subjective criteria including pre-existing degenerative problems, muscle guarding, and range of motion testing. Pro Transportation also contends that Dr. Prychodko used a method of assigning an impairment rating that allows consideration of non-verifiable, subjective complaints when assessing permanent-partial impairment.

The record indicates that the Commission based its decision to reduce Coleman's disability rating from eleven percent to four-and-one-half percent on the February 6, 2004 correspondence between counsel from Pro Transportation and Dr. Moore. This is not disputed, although the correspondence is unclear and nothing in the record explains the correspondence.

The Commission rejected the ten-percent impairment rating assigned by Dr. Prychodko in his October 8, 2003 letter and it rejected the eleven-percent impairment rating assigned by Dr. Prychodko in his September 2004 deposition testimony. In doing so, the Commission recognized that the March 2003 lumbar MRI

revealed that Coleman had "degenerative bulging" and an "annular tear." The Commission, however, stated that nothing in the *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993) allowed a permanent-impairment rating to be assigned based upon an annular tear. The Commission cited its own case precedent for this proposition.

There is no dispute that Dr. Prychodko became Coleman's treating physician in February 2003 and that Dr. Moore saw Coleman on one occasion on September 24, 2003. Dr. Prychodko assigned a ten-percent permanent impairment rating to Coleman on October 8, 2003, and Dr. Moore agreed with that rating in a letter that he penned on November 11, 2003. Counsel for Pro Transportation wrote a letter to Dr. Moore two months later asking Dr. Moore to re-evaluate his opinion regarding the ten-percent impairment rating and Dr. Moore wrote unexplained notes in the margin.

Dr. Prychodko testified under oath that he assigned a five-percent impairment rating to Coleman's cervical spine based upon uncinate hypertrophy and muscle spasms. Dr. Prychodko further testified that he assigned this rating according to the AMA Guides to permanent impairment. Dr. Prychodko testified that he assigned a six-percent impairment rating to Coleman's lumbar spine based upon an annular tear and spondylosis. He testified that the six-percent rating was assigned according to the AMA Guides to permanent impairment. Dr. Prychodko also listed a number of other findings such as back pain, neck pain and soreness, and chest pain.

Dr. Prychodko's deposition testimony is substantial evidence supporting Coleman's claim for five-percent permanent impairment to the cervical spine and six-percent permanent impairment to the lumbar spine. This is true because Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2002) provides that "[a]ny determination of the existence or extent of physical impairment shall be supported by objective and measurable physical or mental findings." Further, this court has recently held that "there is no requirement that medical testimony be based solely or expressly on objective findings, only that the record contain supporting objective findings." *Singleton v. City of Pine Bluff*, 97 Ark. App. 59, 244 S.W.3d 709 (2006). Dr. Prychodko's opinions were supported by both objective and subjective findings. Although the subjective findings would be insufficient by themselves to support Coleman's

claims, these findings are undergirded by objective findings. Therefore Coleman presented sufficient evidence to support his claim for an impairment rating of eleven-percent permanent-partial disability.

We would not overturn the Commission's ruling if this were simply a case of dueling doctors' opinions. In this case, however, there is no reliable evidence rebutting the substantial evidence showing that Coleman should be assigned a five-percent permanent-impairment rating to the cervical spine and a six-percent permanent-impairment rating to the lumbar spine. The only item in the record supporting Pro Transportation's assertion that Coleman should be assigned a four-and-one-half percent impairment rating is the letter from Pro Transportation's counsel containing the notes in the margin. This is simply insufficient evidence.

Moreover, it is undisputed that Dr. Moore saw Coleman one time and penned a letter agreeing with Dr. Prychodko's initial ten-percent rating. Pro Transportation's counsel later asked Dr. Moore to re-evaluate his opinion in light of Table 75 of the AMA Guides and Dr. Moore made notes in the margins of the letter written to him. Although those notes can perhaps be read as averaging impairment ratings which resulted in a four-and-one-half percent rating, Dr. Moore offered no further comment or even a statement that it was in fact his opinion. On the other hand, when Dr. Prychodko was asked to reassess Coleman using Table 75, Dr. Prychodko explained that it would be inappropriate to use Table 75 in the fashion directed by Pro Transportation's counsel because it was designed to be used with range-of-motion testing. Dr. Prychodko further stated that range-of-motion testing is impermissible in assessing anatomical impairment. Dr. Prychodko also stated that if Table 75 were used appropriately, it would still result in a total eleven-percent anatomical rating.

Other than Dr. Moore's November 11, 2003 letter finding that Coleman should be assigned a ten-percent permanent-impairment rating, Pro Transportation has failed to put on any other evidence satisfying Ark. Code Ann. § 11-9-704(c)(1)(B). Here, the scribbled notes of Dr. Moore failed to give any indication of the meaning of or basis for his notes. Dr. Moore's notes, in this instance, not only fail to meet the requirements of the statute but they also seem to indicate that legal counsel was dictating how Dr. Moore was to use the AMA guides. The Commission then speculated as to the meaning of Dr. Moore's scribbles and accepted

them without any evidence to support a rating as is required by Ark. Code Ann. § 11-9-704(c)(1)(B).

■ The Commission disregarded the evidence that conformed to Ark. Code Ann. § 11-9-704(c)(1)(B) and accepted the evidence that failed to comply with the statute. Dr. Prychodko's statements and sworn testimony, as well as Dr. Moore's November 11, 2003 letter, all complied with the statute while Dr. Moore's margin notes did not. In short, while the Commission is free to weigh the medical evidence, it cannot arbitrarily disregard medical evidence. *See Patchell v. Wal-Mart Stores*, 86 Ark. App. 230, 184 S.W.3d 31 (2004). Here, the Commission's decision to disregard the considerable evidence of the eleven-percent impairment rating goes beyond a mere weighing of the evidence, and is not supported by substantial evidence.

We have often said that, while the substantial evidence standard of review serves to insulate the Commission from judicial review, a total insulation would render our function in these cases meaningless. *See, e.g., Boyd v. Dana Corp.* 62 Ark. App. 78, 966 S.W.2d 946 (1998). Accordingly, we reverse and remand to the Commission to assign the impairment rating consistent with the AMA Guides and the clear and substantial evidence in this case.

Coleman also claims that he is entitled to wage-loss benefits of at least forty-five percent. He cites Ark. Code Ann. § 11-9-522 (Repl. 2002), which provides in pertinent part:

> (b)(1) In considering claims for permanent partial disability benefits in excess of the employee's percentage of permanent physical impairment, the Workers' Compensation Commission may take into account, in addition to the percentage of permanent physical impairment, such factors as the employee's age, education, work experience, and other matters reasonably expected to affect his or her future earning capacity.

> (2) However, so long as an employee, subsequent to his or her injury, has returned to work, has obtained other employment, or has a bona fide and reasonably obtainable offer to be employed at wages equal to or greater than his or her average weekly wage at the time of the accident, he or she shall not be entitled to permanent partial disability benefits in excess of the percentage of permanent physical impairment established by a preponderance of the medical testimony and evidence.

(c)(1) The employer or his or her workers' compensation insurance carrier shall have the burden of proving the employee's employment, or the employee's receipt of a bona fide offer to be employed, at wages equal to or greater than his or her average weekly wage at the time of the accident.

Coleman argues that the record shows he will never work again as an over-the-road driver earning $47,000 per year. He now works at Lowe's earning $17,000 per year, which amounts to a sixty-percent wage loss. Therefore, he argues that he proved at least the forty-five percent wage loss found by the ALJ.

Pro Transportation counters that the wage-loss disability analysis is not limited to a determination of the extent to which Coleman can return to his previous employment, and that the Commission must examine his employability as a whole. It argues that Coleman's FCE indicated that he made less than maximum effort during the testing, that Coleman was able to perform medium-duty employment, and that Dr. Prychodko conceded that he expected Coleman to have at least reached the medium level of functioning given the strides he had been making in the spring and summer of 2003. Pro Transportation further argues that Coleman's education and experience are significant factors in finding that the Commission relied on substantial evidence when it determined his entitlement to wage-loss disability.

■ In light of our reversal of the Commission's four-and-one-half percent anatomical rating, we reverse and remand the Commission's decision awarding ten percent wage-loss disability. We direct the Commission to consider the wage-loss award in light of the increase in Coleman's anatomical rating.

Finally, Coleman argues that the Commission erred in reversing the ALJ, citing *Kimbell v. Ass'n of Rehab Industry & Business Companion*, 366 Ark. 297, 235 SW.3d 499 (2006). In *Kimbell*, Chief Justice Hannah expressed in a footnote to the majority opinion his willingness to address the issue of whether a consitutional violation may result when the Commission and a reviewing court are permitted to ignore the findings of an ALJ, the only adjudicator to see and hear the witnesses. In that case, Justice Glaze further suggested in his concurring opinion that this issue should be raised, noting that previous opinions have pointed out the logical fallacy of permitting the Commission to make credibility determinations without having observed the witnesses and their demeanor.

In the present case, however, Dr. Prychodko testified via deposition and did not appear live before the ALJ. Therefore, the Commission had the same opportunity as the ALJ to review his testimony and assess his credibility. Moreover, we need not consider this issue because we are reversing the Commission's decision to reduce Coleman's anatomical rating on the basis that the Commission's decision is not supported by substantial evidence.

Affirmed in part; reversed and remanded in part.

HART, BIRD, and BAKER, JJ., agree.

GLADWIN and VAUGHT, JJ., dissent.

R OBERT J. GLADWIN, Judge, dissenting. The majority has determined that it is in a better position to weigh the conflicting evidence in this case than the Workers' Compensation Commission. This is not the function of this court; therefore, I dissent.

I agree with the majority on the four points in which they affirm the Commission, but I would also affirm on appellant's permanent-impairment rating and wage-loss benefits. There is no dispute that appellant, John Coleman, was entitled to a permanent-impairment rating. Dr. Prychodko, in his report of October 8, 2003, stated that appellant had reached maximum-medical improvement. He also found that his lumbar impairment is DRE Category II (Guides to the Evaluation of Permanent Impairment, 4th Ed., Chpt. 3, p. 102) giving five percent to the whole person. The cervical impairment is also DRE Category II (Guides, Ch. 3, p. 104) at five percent. The other injuries have healed and are rated at zero percent. The combined whole-person impairment rating was ten percent. Later, during his deposition testimony, Dr. Prychodko raised appellant's whole-person impairment rating to eleven percent. On November 11, 2003, Dr. Moore wrote that he had no quarrel with Dr. Prychodko's findings. Subsequently, appellees' attorney sent a letter to Dr. Moore, which stated:

> Thank you for your file notes on Mr. Coleman dated November 11, 2003. However, this report does not answer the question regarding Mr. Coleman's impairment rating according to Table 75. Please address this impairment rating pursuant to Table 75. Thank you. Dr. Moore.

In the margin of this letter is found the following handwritten note:

Table 75 AMA 4th Ed.

| II | A | |
|----|----|----|
| | Cx | 0% |
| | L | 0% |
| | B Cx | 4% |
| | L | 5% |
| Average Cx | | 2% |
| | L | 2½ ___ PPD |

J. Moore M.D.

The Commission weighed these notes along with the report of Dr. Prychodko and awarded appellant a permanent-impairment rating of four-and-a-half percent.

The majority concedes that "*the medical evidence bearing on the issue of Coleman's entitlement to the 11% rating is to some extent conflicting.*" (Emphasis added.) The majority further states that an attorney for one party dictated how Dr. Moore should use the AMA guides. That is simply not supported by the record. Dr. Moore was asked to consider appellant's impairment rating in light of Table 75. The majority seems to suggest that it is impermissible for the Commission to consider an answer given in response to a direct question from an attorney. Of course, this is how virtually all evidence is submitted to a finder of fact.

The majority next states that Dr. Moore's handwritten notes, were "scribbled numbers[,] which can perhaps be read as an averaging of the impairment ratings resulting in a 4½% rating." The majority further states that Dr. Moore provides no further comment. These notes can be read in no other way than to find that Dr. Moore utilized Table 75 of the AMA guidelines, 4th edition, in assessing appellant's impairment. Under subheading II A, he found cervical impairment of zero percent and lumbar impairment of zero percent, and under part B, he found cervical impairment of four percent and lumbar impairment at five percent. This equated to an average cervical impairment of two percent and average lumbar impairment of two-and-a-half percent.

The Commission is free to weigh this conflicting evidence and reach the decision it did, and we should not reverse if it is supported by substantial evidence. This court reviews a decision of the Workers' Compensation Commission to determine if there is

substantial evidence to support it. *Rice v. Georgia Pac. Corp.*, 72 Ark. App. 148, 35 S.W.3d 328 (2000). Substantial evidence is that relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Wheeler Constr. Co. v. Armstrong*, 73 Ark. App. 146, 41 S.W.3d 822 (2001). We review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings and we affirm if its findings are supportable by substantial evidence. *Geo Specialty Chem., Inc. v. Clingan*, 69 Ark. App. 369, 13 S.W.3d 218 (2000). This issue is not whether we might have reached a different decision or whether the evidence would have supported a contrary finding; instead, we affirm if reasonable minds could have reached the conclusion rendered by the Commission. *Sharp Co. Sheriff's Dep't v. Ozark Acres Improvem't Dist.*, 75 Ark. App. 250, 57 S.W.3d 764 (2001).

In this case it is undisputed that the appellant is entitled to a permanent-impairment rating. However, the majority admits that "the medical evidence bearing on the issue of Coleman's entitlement to the 11% rating is to some extent conflicting." I would defer to the Commission's findings as to the weight to be afforded this conflicting evidence. As I would affirm the Commission's finding as to the anatomical-impairment rating, I would also affirm on appellant's wage-loss benefits.

VAUGHT, J., joins.