ESTATE of Jerry SLAUGHTER *v.* CITY of HAMPTON

CA 06-1077                                              255 S.W.3d 872

Court of Appeals of Arkansas
Opinion delivered April 25, 2007

*Compton, Prewitt, Thomas & Hickey, LLP*, by: *F. Mattison Thomas, III*, for appellant.

*J. Chris Bradley*, for appellee. ·

SARAH HEFFLEY, Judge. In this workers' compensation case, Jerry Slaughter was exposed to chlorine gas on November 17, 2004,[1] during the course and scope of his employment with appellee, the City of Hampton. On December 22, he was admitted to the hospital, where testing revealed that he was infected with the HIV virus and that he also had Chronic Obstructive Pulmonary Disease (COPD) in the form of emphysema. At the time of the accident, Slaughter had been engaged to and was living with La'Ronda Slaughter. They were married in a ceremony performed at the hospital on January 5, 2005. Slaughter died ten days later. He was thirty-five years old.

La'Ronda Slaughter, as executrix of Slaughter's estate, filed a claim with the Arkansas Workers' Compensation Commission seeking temporary-total disability benefits and the payment of medical expenses, funeral expenses, and spousal death benefits. The Commission denied this claim based on a finding that Slaughter's work-related accident was not the major cause of his physical harm, as required by Ark. Code Ann. § 11-9-114 (Repl. 2002). Appellant contends on appeal that the Commission's decision is not supported by substantial evidence. We agree and reverse and remand.

The applicable statute in this case, Ark. Code Ann. § 11-9-114, governs the compensability of heart and lung injury or illness. It provides:

---

[1] There was some dispute as to the actual date of the occurrence, but the parties stipulated that the accident took place on this date.

(a) A cardiovascular, coronary, pulmonary, respiratory, or cere-brovascular accident or myocardial infarction causing injury, illness, or death is a compensable injury only if, in relation to other factors contributing to the physical harm, an accident is the major cause of the physical harm.

(b)(1) An injury or disease included in subsection (a) of this section shall not be deemed to be a compensable injury unless it is shown that the exertion of the work necessary to precipitate the disability or death was extraordinary and unusual in comparison to the employee's usual work in the course of the employee's regular employment or, alternatively, that some unusual and unpredicted incident occurred which is found to have been the major cause of the physical harm.

(2) Stress, physical or mental, shall not be considered in deter-mining whether the employee or claimant has met his or her burden of proof.

The term "major cause" means more than fifty percent of the cause, which must be established by a preponderance of the evidence. Ark. Code Ann. § 11-9-102(14)(A) & (B) (Supp. 2005).

In appeals involving claims for workers' compensation, we view the evidence in a light most favorable to the Commission's decision and affirm if it is supported by substantial evidence. *Freeman v. Con-Agra Frozen Foods,* 344 Ark. 296, 40 S.W.3d 760 (2001). Substantial evidence is that relevant evidence that a rea-sonable mind might accept as adequate to support a conclusion. *Coleman v. Pro Transportation, Inc.,* 97 Ark. App. 338, 249 S.W.3d 149 (2007). We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Freeman v. Con-Agra Frozen Foods, supra.* We defer to the Commission on issues involving the weight of the evidence and credibility of the witnesses, but while the Commission's findings on these matters are insulated to a certain degree, its decisions are not so insulated as to render appellate review mean-ingless. *Lloyd v. United Parcel Service,* 69 Ark. App. 92, 9 S.W.3d 564 (2000).

The record shows that Slaughter worked in the city's water department. His duties included changing 150-pound cylinders of chlorine gas that were housed in a small building beneath the city's

water tower. On November 17, 2004, Slaughter was performing this task with fellow employees Buddy Hannegan and Monroe Slaughter, his father. The city had provided only one mask for the three of them to wear, and it was worn that day by Monroe. Unbeknownst to the men, the valve to the new cylinder being installed had a crack in it, and when Slaughter opened the valve, chlorine gas spewed directly in his face. All three were overcome by the gas and ran out of the building, but according to Monroe and Hannegan, Slaughter bore the brunt of the leak. Outside, Slaughter was bent over gagging, coughing, and gasping for breath. Later his eyes became irritated and mucus ran from his nose. After the building aired out, Monroe and Hannegan replaced the cylinder while Slaughter remained outside. As it was quitting time, they left for home. Slaughter declined Hannegan's offer to drive him home.

Slaughter returned to work the next day. Monroe testified that Slaughter was not feeling well and was having trouble breathing. Slaughter told him that his throat was sore and felt like it had a knot in it. Monroe said that, because Slaughter was feeling so poorly, he and Hannegan did not let him do much work. He considered Slaughter to be a hard worker, but said that he never worked hard again. He did not believe Slaughter worked much after the accident, and he thought Slaughter also took all of his sick leave and vacation time following the accident. Monroe testified that Slaughter was not the kind of individual who went to the doctor and that, as far as he knew, Slaughter had not been ill prior to the accident.

Hannegan testified that Slaughter "looked pretty rough" the day after the accident. He said Slaughter was "spitting up stuff," lacked energy, and was having trouble breathing. He said Slaughter was worse when he came to work two days later. He did not believe Slaughter worked more than a day and a half after the accident.

La'Ronda Slaughter testified that Slaughter came in from work on the day of the accident and said, "Baby, I like to have gotten killed today." Slaughter was late getting home and explained that he had to stop for a while on the way because he could not breathe. He had a normal appetite that evening, but La'Ronda had to help him up the stairs to bed. She testified that he panted a lot during the night and did not sleep well. When he came home

after work the next day, he was still panting and breathing hard. As time went on, he became worse, and she finally persuaded him to see a doctor.

Slaughter saw Dr. Robert Watson on December 9, 2004, and complained of shortness of breath and chest congestion. X-rays revealed no infiltrates in the lungs, but pulmonary function tests did indicate that his breathing was obstructed. Although Dr. Watson's notes do not indicate that Slaughter mentioned the chlorine-gas incident, La'Ronda testified that she was present during the examination and that Dr. Watson was informed about the accident. Dr. Watson's impression was that of upper respiratory infection, acute bronchitis, restricted lung disease, and shortness of breath. He encouraged Slaughter to stop smoking and prescribed a round of steroids, Advair, antibiotics, and cough medicine. Slaughter was advised to return in two weeks.

La'Ronda testified that the medication did not help and that she had wanted Slaughter to return to the doctor sooner than in two weeks. Nevertheless, Slaughter waited until December 22 to return to Dr. Watson. Slaughter's pulse oximeter reading had declined to 60%, and Dr. Watson noted that he was hypoxic and tachypneic, and that his shortness of breath and pulmonary function had worsened. Because Slaughter's condition had substantially deteriorated, Dr. Watson immediately placed him in the hospital, where he came under the care of Dr. Richard Dietzen, and it was discovered that Slaughter was HIV positive.

La'Ronda testified that Slaughter had not previously known that he had HIV and that he did not know how he had contracted it. She acknowledged that Slaughter had recently lost ten pounds, but she said that was not unusual because of the way he worked in the summer time.

Steve Daniell, the Chief of Police for appellee, was Slaughter's supervisor. According to the attendance records, Slaughter worked the day following the incident, a Thursday. Slaughter took a sick day that Friday and a vacation day on November 24. He did not work at all after December 9.

Slaughter ended his days on a ventilator in the intensive-care unit of the hospital. Dr. Watson's discharge summary gave diagnoses of respiratory failure, pneumonia, end-stage HIV, COPD, and chemical inhalation. On the death certificate, Dr. Watson listed respiratory failure as the immediate cause of death, due to bacterial pneumonia, fungal pneumonia, and chemical inhalation.

In terms of medical testimony, the Commission had before it the depositions of two physicians: Dr. Jimmie Gilbert, a pulmonologist, who was retained by appellee to review the medical records, and Dr. Richard Dietzen, the respiratory specialist who treated Slaughter at the hospital. Dr. Gilbert testified that chlorine gas is a pulmonary irritant and that severe exposure can lead to lung injury, pulmonary edema, and death. It was Dr. Gilbert's opinion, however, that Slaughter's exposure to chlorine gas played no significant role in Slaughter's demise. This opinion was based on the presence of Slaughter's preexisting conditions and on the fact that Slaughter had not sought immediate medical attention. Dr. Gilbert believed that Slaughter's death was caused instead by pneumocystis carnii, a parasitical infection commonly associated with HIV. Dr. Gilbert testified, however, that he would defer to Dr. Dietzen in the matter because his was a more informed opinion, since Dr. Dietzen had treated Slaughter in the hospital.

Dr. Dietzen testified that Slaughter had preexisting conditions of emphysematous bullae, a more advanced form of emphysema, and COPD, which overlapped with the emphysema and Slaughter's habit of smoking. The presence of bullae indicated that Slaughter's lungs had been significantly damaged by the emphysema, but he said that the damage did not necessarily correlate with decreased lung function. Contrary to Dr. Gilbert's assertion, Dr. Dietzen found no clear evidence of pneumocistis carinii,[2] and he opined that Slaughter did not have pneumocystis. Although Slaughter's CD4 count was low, evidencing the presence of HIV, he said there was no bacterial or fungal pulmonary infection. He stated that a person could be infected with the HIV virus and not show any symptoms for a number of years. He said that Slaughter, with the history of HIV and smoking, was on a course that would have eventually required him to seek medical attention. Dr. Dietzen testified, however, that once diagnosed with HIV, a person can live a fairly normal life for an extended period of time with appropriate treatment.

It was Dr. Dietzen's opinion that the chemical inhalation set a process in motion where Slaughter's lungs began to deteriorate with alveolar and bronchiolar damage, which occurred in a setting of decreased defenses due to HIV and smoking. He said that chlorine is a well-known injurant to the airways of the lungs that

---

[2] Although this infection was considered as a possible diagnosis, Dr. Dietzen testified that it was not confirmed upon further testing.

forms hydrochloric acid within the tissues of the bronchi and alveoli, resulting in bronchiolitis or inflammation of the airways "from top to bottom all the way down to the air sac." He testified that the chlorine exposure was a "significant inciting event" that was "greater than fifty percent" among the multiple causes of Slaughter's respiratory failure.

In its decision, the Commission found that Dr. Dietzen's opinion as to causation was more credible than that of Dr. Gilbert. The Commission also accepted that Slaughter's exposure to chlorine gas qualified as an "unusual and unpredicted incident" under Ark. Code Ann. § 11-9-114 but determined that the chemical inhalation was not the major cause of his physical harm "in relation to other factors." The Commission reasoned that Slaughter's exposure to chlorine gas was "but one factor" leading to his respiratory failure, based on the following excerpt from Dr. Dietzen's testimony when he was being questioned by appellees' attorney:

Q. Back again to the chlorine. You found physical findings that suggested deviation formed [sic] normal but those findings could be consistent with other disease process or with chlorine inhalation?

A. Yes.

Q. So you can't really tell which one it was then?

A. We're discussing basically a nature of contributory processes here. To say that I can't really tell which one it was is to create the impression that it had no relevance or that I think it had no relevance.

Q. The fact that your physical findings could just as easily be one disease process that Mr. Slaughter had in his body as well as it could be the other one.

A. The physical findings could have a multitude of explanations. The disease process could have a multitude of explanations. My opinion is that the contribution by the chlorine gas inhalation into the evolution of the process that led to his death.

Q. So what I think I hear you saying is that the chlorine inhalation may have aggravated his underlying condition?

A. Yes.

Q. May have precipitated the aggravation or started things off more.

A. Yes.

Q. If you were to take those items that Mr. Slaughter already had in play and put them on a balance like you see with scales of justice, and you piled them up on one side and then you put the chlorine as a causative factor on the other side, which side would weigh heavier?

A. The heaviest weight in you analogy would lay to the preexisting factors.

Q. So the chlorine would play a role in Mr. Slaughter's illness but it would not be the major cause, meaning more than fifty percent of the problems Mr. Slaughter had?

A. It could be as what we're dealing with is the straw that breaks the camel's back. Where you can phrase it as you did where you're weighing the contributory causes or you could phrase as you had these contributory causes was this something that tipped him over to become symptomatic and therefore led to his hospitalization.

Q. Well if it were the tipping point that would be dependent upon something being tipped.

A. Yes.

Appellant's argument that substantial evidence does not support the Commission's decision is well taken. In workers' compensation law, an employer takes the employee as he finds him. *Parker v. Atlantic Research Corp.,* 87 Ark. App. 145, 189 S.W.3d 449 (2004). We have been steadfast in our interpretation of Ark. Code Ann. § 11-9-114 that preexisting conditions do not preclude a finding that a work-related incident is the major cause of physical harm. *Cloverleaf Express v. Fouts,* 91 Ark. App. 4, 207 S.W.3d 576 (2005) (affirming decision that strenuous work activity was the major cause of the employee's physical harm even where there was a history of serious cardiac illness); *Huffy Service First v. Ledbetter,* 76 Ark. App. 533, 69 S.W.3d 449 (2002) (affirming decision that work conditions were the major cause of the employee's heart attack despite history of arterial blockage). For

instance, in *Williford v. City of North Little Rock,* 62 Ark. App. 198, 969 S.W.2d 687 (1998), Williford was a fireman who died of a heart attack within forty-eight hours of engaging in a strenuous performance test in hot weather. Although he had displayed no previous symptoms of a heart condition, his autopsy revealed chronic pulmonary disease, hypertension, COPD, and diabetes. We reversed the Commission's denial of benefits because the Commission ignored the pathologist's opinion that, despite his preexisting conditions, the agility test was the major cause of the heart attack.

Although the previous cases that have come before us involved heart attacks, the law we must apply to the facts of this case is the same. Here, Slaughter showed no signs of acute illness or respiratory distress prior to his inhalation of chlorine gas. The record is clear that Slaughter experienced a downward spiral in his health after the accident. In denying benefits, the Commission singled out one portion of Dr. Dietzen's testimony to find that the exposure to chlorine gas was "but one" cause of Slaughter's physical harm. However, to say that Dr. Dietzen considered the exposure to chlorine gas as simply one cause of Slaughter's physical harm is a mischaracterization of Dr. Dietzen's opinion. On the contrary, Dr. Dietzen was resolute in his opinion that the inhalation of chlorine gas was the major precipitating event that led to Slaughter's respiratory failure. We are firmly convinced that fairminded persons with the same facts before them could not have reached the decision made by the Commission. We therefore reverse and remand for proceedings consistent with this opinion.

Reversed and remanded.

ROBBINS and GLOVER, JJ., agree.