Richard KIMBELL *v.* ASSOCIATION of REHAB INDUSTRY & BUSINESS COMPANION PROPERTY & CASUALTY

05-1319 235 S.W.3d 499

Supreme Court of Arkansas
Opinion delivered May 11, 2006

[Rehearing denied June 22, 2006.*]

---

* IMBER and DICKEY, JJ., would grant rehearing.

Kinard, Crane & Butler, P.A., by: Mike Kinard, for petitioner/appellant.

Caldwell Law Firm, P.A., by: Andy L. Caldwell, for respondents/appellees.

JIM HANNAH, Chief Justice. Appellant Richard Kimbell sustained injuries when he fell off a porch at his workplace, Association of Rehab Industry & Business, following an alleged altercation with Stanley Minor. Kimbell submitted a claim for workers' compensation, and the administrative law judge found that Kimbell had proved that he sustained a compensable injury and that he was entitled to all medical treatment reasonably necessary in connection with the compensable injury. In a 2-1 decision, the Workers' Compensation Commission reversed the ALJ's decision based on its finding that Kimbell did not sustain a compensable injury because he was not performing employment services at the time of his accident and because his injury was idiopathic in nature. In an unpublished opinion, the court of appeals affirmed the Commission.

*2Kimbell v. Ass'n of Rehab Indus.*, CA05-212 (Ark. App. Nov. 16, 2005). Kimbell then filed a petition for review, which this court granted, pursuant to Ark. Sup. Ct. R. 1-2(e).

Upon a petition for review, we consider an appeal as though it has been originally filed in this court. *See Wallace v. West Fraser South, Inc.*, 365 Ark. 68, 255 S.W.3d 361 (2006). On appeal, Kimbell argues that there is no substantial evidence to support the Commission's conclusion that he was not performing employment services when he was injured. He further argues that there is no substantial evidence to support the Commission's conclusion that his fall was idiopathic in nature. We agree and, accordingly, we reverse and remand.

As an employment specialist for Rehab Industry, Kimbell helped disabled people find jobs. On May 27, 2003, Kimbell was working out of an office at the Ross Center in Camden, when he stepped outside onto a porch to take a break and smoke a cigarette. While on the porch, Kimbell was approached by Stanley Minor, who had come to the Ross Center to get some information about social security disability benefits and to inquire about a "ticket to work" that he had received.

Kimbell and Minor agree that they discussed the "ticket to work," but the two gave conflicting accounts of what happened during that discussion. Kimbell testified that when Minor approached him on the porch, he was "madder than hell." Kimbell explained to Minor that the "ticket to work" meant that he would not receive his disability check. Minor repeatedly said "no" and became even more irritated. Kimbell testified that Minor kept stepping toward him, and then stepping away, and he was afraid of what Minor might do. Kimbell said that the third time Minor approached him, he stepped back and accidentally stepped off the porch and into a hole in the ground. Kimbell said that as he began to fall, he twisted his body to the right and landed on his right side, hitting his head, right shoulder, hip, and knee.

Robin Heard, who worked with Kimbell at the Ross Center, learned of the accident from a client. She went outside and saw Kimbell kneeling as if he were trying to pull himself up off the ground. Heard said that Minor had been in her office earlier that morning and had become angry at her because she could not help him. She said that Minor had been in such an agitated state that he threw some paperwork on her desk. Heard testified that, following the accident, Kimbell's speech was slurred and that he mentioned that he had been talking to a man when the accident occurred.

Paige Davis, another one of Kimbell's coworkers, testified that prior to the accident, Kimbell told her he was going outside to smoke a cigarette and would be back in a few minutes. After learning of the accident from Heard, Davis went outside to help Kimbell. Davis also said that Kimbell's speech was slurred, but when she finally began to understand him, he said that he was talking to somebody and then fell.

Kimbell was transported by ambulance to Ouachita County Medical Center and admitted. Dr. Dan Martin's medical records indicated that Kimbell had become "quite dizzy" prior to the fall. Based upon both his examination of Kimbell and information contained in radiology reports, Dr. Martin assessed Kimbell with "fall, possible TIA [transient ischemic attack], possible sleep apnea," a right inferior pubic ramus fracture, high blood pressure, and hypothyroidism by history. Dr. Martin's final diagnosis upon discharge identified a pelvic fracture and probable sleep apnea. Kimbell subsequently followed up with his regular physician, Dr. Patrick Antoon. Dr. Antoon diagnosed sleep apnea, but reported that Kimbell's injury was accidental and due to tripping and falling and was not caused by a TIA or syncope.

In its opinion denying Kimbell's claim, the Commission found that Kimbell's injury did not occur while he was performing employment services, in that he was not engaged in an activity that carried out his employer's interest when he chose to step outside for a smoke break. Further, the Commission found that even if Minor had asked Kimbell work-related questions, Minor did not have an appointment with Kimbell and was not Kimbell's authorized client. The Commission determined that Minor imposed himself on Kimbell and that Kimbell responded by placating Minor, possibly out of fear and that, "[f]or whatever reason, [Kimbell] *chose* to address Minor's issues while on break . . . ." The Commission found that, although Minor's testimony was "somewhat difficult to follow," he consistently denied being with Kimbell on the porch at the time of the fall. The Commission also noted that, while other testimony showed that Kimbell was confused and disoriented after the fall and that he mentioned having spoken to a man on the porch, he did not say that the man had caused the accident. In addition, the Commission gave little weight to the testimony of Heard and Davis because neither coworker witnessed the accident or the events leading up to it.

The Commission also found that Minor's account of the accident was consistent with accounts contained in medical evidence. Specifically, the Commission noted that Kimbell never told

Dr. Martin that, at the time of the accident, he was speaking to Minor, nor did he suggest that he was frightened off of the porch by anyone. In addressing the nature of the accident, the Commission gave greater weight to Dr. Martin's opinion because his reports were prepared contemporaneously with Kimbell's accident. In contrast, the Commission determined that Dr. Antoon's opinion that Kimbell's fall was not related to TIA was not supported by objective medical findings. Therefore, the Commission concluded that the weight of credible evidence supported a finding that Kimbell's fall was idiopathic in nature and origin.

In appeals involving claims for workers' compensation, this court views the evidence in a light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *Arbaugh v. AG Processing, Inc.*, 360 Ark. 491, 202 S.W.3d 519 (2005). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Williams v. Prostaff Temps.*, 336 Ark. 510, 988 S.W.2d 1 (1999). The issue is not whether the appellate court might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, the appellate court must affirm the decision. *Minnesota Mining & Mfg. v. Baker*, 337 Ark. 94, 989 S.W.2d 151 (1999). Where the Commission denies a claim because of the claimant's failure to meet his burden of proof, the substantial-evidence standard of review requires that we affirm if the Commission's decision displays a substantial basis for the denial of relief. *Wallace, supra; Davis v. Old Dominion Freight Line, Inc.*, 341 Ark. 751, 20 S.W.3d 326 (2000).

A compensable injury is defined, in part, as an accidental injury "arising out of and in the course of employment." Ark. Code Ann. § 11-9-102(4)(A)(i) (Repl. 2002). A compensable injury does not include an "[i]njury which was inflicted upon the employee at a time when employment services were not being performed." Ark. Code Ann. § 11-9-102(4)(B)(iii) (Repl. 2002). This court has held that an employee is performing "employment services" when he or she "is doing something that is generally required by his or her employer." *Wallace, supra; Pifer v. Single Source Trans.*, 347 Ark. 851, 69 S.W.3d 1 (2002); *Collins v. Excel Specialty Prods.*, 347 Ark. 811, 69 S.W.3d 14 (2002); *White v. Georgia-Pacific Corp.*, 339 Ark. 474, 6 S.W.3d 98 (1999); *Olsen Kimberly Quality Care v. Pettey*, 328 Ark. 381, 944 S.W.2d 524 (1997). We must determine whether the injury occurred "within the time and space boundaries of the employment, when the

employee [was] carrying out the employer's purpose or advancing the employer's interest directly or indirectly." *Wallace*, 365 Ark. at 72, 225 S.W.3d at 365 (quoting *White*, 339 Ark. at 478, 6 S.W.3d at 100).

Clearly, Kimbell's injuries occurred within the "time and space boundaries of his employment." The question is whether he was "carrying out the employer's interest or advancing the employer's interest directly or indirectly." As noted above, the Commission concluded that, at the time of his injury, Kimbell was on a break and not engaged in an activity that carried out his employer's interest when he chose to step outside and away from his desk for a smoke break. In support of its decision, the Commission relied upon a prior Commission opinion, *McCool v. Disabled American Veterans*, E410491 (June 3, 1996), and a prior court of appeals decision, *McKinney v. Trane Co.*, 84 Ark. App. 424, 143 S.W.3d 581 (2004). Both of those cases are distinguishable from the instant case.

In *McCool*, the claimant was injured when she was returning to her work area after going outside to smoke. The Commission found that McCool's injury was not compensable, stating:

> In the present claim, the claimant testified that she was not working at the time of the incident and that she had gone outside to smoke a cigarette. In fact, the evidence reflects that she went to smoke shortly after 8:00 a.m. Her own testimony is that she had to arrive at work only before the vans arrived, and that the vans usually started arriving from 8:30 to 8:45 a.m. each day. In addition, her testimony is that she wanted to make sure she had a cigarette before she "got real busy." Therefore, at the time the claimant went outside to smoke on February 3, 1994, she had not even begun to perform employment services.
>
> Furthermore, the claimant testified that her sole reason for going down the hall past the offices and outside was to smoke. Her testimony is that the area in which she smoked is almost a football field away from her office. In addition, she testified that after she walked out of her office and passed the next office, there were no other offices which dealt with DAV on her way down the hall in which she fell. The evidence clearly reflects that the area in which the claimant fell is not an area which she commonly uses in her everyday work-related activities. Therefore, based on the foregoing analysis, we find that when the accident occurred, the claimant was not engaged in any activity that carried out the employer's purpose or advanced the employer's interest.

In contrast to the facts in the instant case, in *McCool*, it was clear from the claimant's own testimony that she was not carrying out her employer's interest or advancing the employer's interest, either directly or indirectly. Her sole purpose for going outside was to smoke a cigarette, and while on her smoke break, she did not engage in any employment services. In fact, the evidence in that case indicates that the claimant had not even begun working when she was injured.

In the instant case, Kimbell left his immediate duties and stepped outside to take a break. There is no evidence that he was not allowed or was not expected to take a rest period as part of his duties owed to his employer. Certainly, there is an obvious benefit to an employer in granting and even requiring rest periods, as evidenced by the universal practice of employers' providing such breaks for their employees. As an employment specialist, it was Kimbell's job to discuss disability benefits with clients. While outside, Kimbell spoke to Minor about his "ticket to work." While explaining to Minor how he would be affected by the "ticket to work," Kimbell was advancing his employer's interest. At the time of the injury, Kimbell was at work directly advancing his employer's interest. Thus, the Commission's reliance on *McCool* is misplaced.

Likewise, *McKinney* is distinguishable from the instant case. In *McKinney*, the claimant, a sheet-metal fabricator, was injured when he jumped over some tube sheeting to retrieve his soda so that he could go on his smoke break. The court of appeals affirmed the Commission's denial of benefits and held that McKinney, on his way to his smoke break, was involved in nothing generally required by his employer and was doing nothing to carry out the employer's purpose; thus, the employer gleaned no benefit from his activities on break. The instant case is not analogous to *McKinney*. In this case, Kimbell was on a smoke break when he was approached by Minor, who asked about his "ticket to work." Clearly, Kimbell's employer gleaned some benefit from Kimbell's conversation with Minor. However, our inquiry does not end here. Next, we turn to the Commission's second basis for denial of relief. The Commission determined that, although it was evident that Kimbell had spoken to Minor at some point during his break, it was "questionable" that Kimbell was speaking to Minor about work-related matters, or even at all, at the time of his fall. We disagree. Both Minor and Kimbell testified that they discussed Minor's "ticket to work" while on the porch, a matter that is

clearly related to Kimbell's job as an employment specialist. Furthermore, although the Commission concluded that Minor "consistently denied being on the porch with [Kimbell] at the time of the fall," the record reveals no such consistency. Rather, Minor first testified that, at the time of the fall, he "was coming from the car" when he "heard something," and noticed that Kimbell had fallen. Later, Minor testified that he was "on the porch" with Kimbell at the time of the fall.

██ Appellate courts defer to the Commission on issues involving the weight of evidence and the credibility of witnesses.[1] *Freeman v. Con-Agra Frozen Foods*, 344 Ark. 296, 40 S.W.3d 760 (2001). However, while the Commission may be insulated to a certain degree, it is not so insulated to render appellate review meaningless. *Id.* (citing *Jordan v. J.C. Penney Co.*, 57 Ark. App. 174, 944 S.W.2d 547 (1997)). Likewise, the Commission may not arbitrarily disregard evidence in support of a claim. *Freeman, supra.* Here, in concluding that Minor *consistently* denied being on the porch at the time of the fall, when in fact, Minor testified at one point that he was on the porch with Kimbell at the time of the fall, the Commission has arbitrarily disregarded evidence in support of Kimbell's claim. Moreover, Kimbell was clearly on call and working during his smoke break, as evidenced by his conversation with Minor. In sum, the Commission's conclusion that Kimbell was not

---

[1] In the instant case, the ALJ found that Minor's testimony was not reliable. However, the Commission found credible Minor's testimony that he was not on the porch at the time of the fall. Kimbell does not raise the issue of whether the Commission erred by substituting its opinion regarding the credibility of the testimony for that of the ALJ, who was present at the hearing.

Previously, we have expressed our willingness to address the issue of whether a constitutional violation may result when the Workers' Compensation Commission and a reviewing court are permitted to ignore the findings of an ALJ, the only adjudicator to see and hear the witnesses. *See Scarbrough v. Cherokee Enters.*, 306 Ark. 641, 816 S.W.2d 876 (1991) (citing *Webb v. Workers' Compensation Comm'n*, 292 Ark. 349, 352, 733 S.W.2d 726, 730 (1987) (Newbern, J., concurring), and *Hamby v. Everett*, 4 Ark. App. 52, 55, 627 S.W.2d 266, 267 (1982) (Glaze, J., dissenting)). In *Scarbrough*, we did not address the constitutional question as it relates to credibility issues, because in that case, there was no disagreement among the ALJ and the Commission with respect to the credibility of witnesses. *See also Penter v. Baldwin Piano and Organ Co.*, 309 Ark. 487, 832 S.W.2d 215 (1992). Here, there is a disagreement among the ALJ and the Commission; however, we are again unable to reach the issue because Kimbell failed to raise the issue below. We take this opportunity to once again express our willingness to address this issue in the future.

performing employment services when he was injured is not supported by substantial evidence.

 Finally, in his second point on appeal, Kimbell argues that there was no substantial evidence to show that his fall was an idiopathic injury. An idiopathic fall is one whose cause is personal in nature, or peculiar to the individual. *ERC Contractor Yard & Sales v. Robertson*, 335 Ark. 63, 977 S.W.2d 212 (1998) (citing 1 Larson, Workers' Compensation Law, § 12.11 (1998)). Because an idiopathic fall is not related to employment, it is generally not compensable unless conditions related to employment contribute to risk by placing the employee in a position which increases the dangerous effect of the fall. *Robertson, supra.* As previously noted, Dr. Martin assessed Kimbell with "fall, possible TIA, possible sleep apnea," a right pubic ramus fracture, high blood pressure, and hypothyroidism by history. Then, when Kimbell was discharged four days later, Dr. Martin's diagnosis identified a pelvic fracture, probable sleep apnea, high blood pressure, and hypothyroidism. What caused the fall, other than Kimbell's description of dizziness and light-headedness, is impossible to determine. What is beyond dispute is that Kimbell and Minor had a heated, work-related exchange, and at some point, Kimbell fell. We hold that there is no substantial evidence to support the Commission's finding that Kimbell's injury was idiopathic in nature.

We do not believe that fair-minded persons with the same facts before them could have reached the conclusion arrived at by the Commission. The Commission's decision does not display a substantial basis for the denial of relief. Therefore, we reverse and remand this matter to the Commission for a determination of benefits resulting from Kimbell's injury.

Reversed and remanded.

GLAZE, J., concurs.

IMBER and DICKEY, JJ., dissent.

TOM GLAZE, Justice, concurring. I agree with the majority's conclusions in this case, but I write separately to highlight what the majority has mentioned in a footnote. In this case, appellant Richard Kimbell testified that, although he had gone outside to the porch to take a smoke break, he was answering Stanley Minor's questions about Minor's "ticket to work" at the moment he fell. Minor, on the other hand, testified that he was not on the porch

when Kimbell fell. The Administrative Law Judge, who heard and observed the witnesses, specifically found that Minor's testimony was not credible, noting that, during the course of his testimony, Minor "generally acted in a manner suggesting an unstable personality," and his testimony was "confused and evasive" and "implausible." The ALJ found Kimbell to be the more credible witness, and awarded benefits based on its conclusion that Kimbell was performing employment services at the time of his fall.

On its review, however, the Commission determined that Minor was the more credible witness, and because Minor testified that he was not speaking with Kimbell at the moment of Kimbell's fall, the Commission concluded that Kimbell was not performing employment services at the time of his injury. In sum, even though the Commission did not hear additional testimony, and thus had nothing more than a cold record on which to base its decision, the Commission substituted its view of the credibility of the witnesses for that of the ALJ.

The majority points out that Kimbell failed to raise an argument regarding whether the Commission erred by substituting its opinion for that of the ALJ on the question of the witnesses' credibility; in addition, the majority expresses a "willingness to address this issue in the future." I wish to emphasize this point and suggest that an astute party raise the question directly. In *Scarbrough v. Cherokee Enterprises*, 306 Ark. 641, 816 S.W.2d 876 (1991), this court noted that "[a] reason which might indeed be compelling for holding that the initial fact finder's determinations of facts where credibility is at issue cannot be ignored would be that it deprives a party of due process of law." *Scarbrough*, 306 Ark. at 645. Other concurring and dissenting opinions by this court and the court of appeals have pointed out the logical fallacy of permitting the Commission to make credibility determinations without having observed the witnesses and their demeanors. In *Webb v. Workers' Compensation Comm'n*, 292 Ark. 349, 733 S.W.2d 726 (1987), Justice Newbern rendered a concurring opinion in which he noted the following:

> The adjudication of [Workers' Compensation] claims begins with a hearing before an administrative law judge (ALJ). It is an adversary proceeding, but designed to be informal. The ALJ's decision is then reviewed by the Commission if one party or the other is dissatisfied with the result reached by the ALJ. There may have been a time when the commission actually heard witnesses

give live testimony when its members wished to redo the work of the ALJ. Given the numbers of claims today, however, that would be impractical if not impossible. The Commission has the power to, and presumably does, permit argument before it either orally or in the form of briefs and it may admit additional evidence in its *de novo* review of the decision of the ALJ. It would surely be wasteful, however, to hold the hearing with the live witnesses a second time, so the decision of the Commission is much like that of an appellate court; it operates from a cold, or at best, warmed-over, record.

*Webb*, 292 Ark. at 352-53. Justice Newbern continued, noting that, "[d]espite the fact that it is the ALJ who hears the witnesses and has the opportunity to see them face to face, we persist in holding that his or her decision is meaningless when a decision of the Commission is on appeal." *Id.* at 353. However, he pointed out, "there is a growing minority view . . . that the Commission cannot reverse the findings of fact made by a hearing officer unless the findings are not sustained by competent, substantial evidence, and on appeal from the Commission the court must determine whether the Commission observed the substantial evidence rule when it reviewed the officer's findings and order." *Id.* (citing *United States Cas. Co. v. Maryland Cas. Co.*, 55 So. 2d 741 (Fla. 1951)).

In addition, I wrote a dissent in the court of appeals' decision in *Hamby v. Everett*, 4 Ark. App. 52, 627 S.W.2d 266 (1982), pointing out that "a Board or Commission which reviews a cold record on appeal is in a poor position to weigh the credibility of any witness. It would make as much sense for our court to decide credibility issues in cases appealed to us from either the Employment Security Board of Review or the Workers' Compensation Commission. Of course, we have never done so." *Hamby*, 4 Ark. App. at 55 (Glaze, J., dissenting). I concluded that:

[w]hen the primary or sole issue on appeal becomes one of credibility of the witnesses, I believe the findings of the . . . Commission should not be binding on our courts unless that . . . Commission heard or saw the witnesses. In cases where they fail to call and hear the witnesses, I would adopt the rule that special weight should be given the findings of the hearing examiner who observed the demeanor of the witnesses. I believe the statutory procedures which outline this court's role of review in . . . Workers' Compensation cases permit us to require such a rule. At the least, I feel the Arkansas General Assembly should adopt a law which appropriately

modifies our review in cases where credibility of witnesses appears to be the sole or primary question.

*Id.* at 57.

Hopefully, this issue will be properly raised in the near future so that this court can address and decide it.

A NNABELLE CLINTON IMBER, Justice, dissenting. In reversing the Workers' Compensation Commission, the majority has chosen to ignore our well-established standard of review in workers' compensation cases. On appeal, we view the evidence and all reasonable inferences therefrom in the light most favorable to the Commission's decision and affirm that decision when it is supported by substantial evidence. *Arbaugh v. AG Processing, Inc.*, 360 Ark. 491, 202 S.W.3d 519 (2005). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* There may be substantial evidence to support the Commission's decision even though we might have reached a different conclusion if we had sat as the trier of fact or heard the case *de novo. Id.* It is exclusively within the province of the Commission to determine the credibility and the weight to be accorded to each witness's testimony. *Id.* We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Id.*

In keeping with this standard of review, we should affirm the Commission's finding that Kimbell did not sustain a compensable injury because he was not performing employment services at the time of his accident. Stanley Minor's testimony reveals that he had a work-related conversation with Kimbell who had walked out onto the porch to smoke a cigarette, but that Kimbell fell after their conversation was over. Specifically, when asked where he was at the time of Kimbell's fall, Minor attested that he was returning to the building from his car when he heard him fall. In fact, the transcript of Minor's testimony clearly demonstrates why there is substantial evidence to support the Commission's decision, as shown in the following lengthy colloquy:

DIRECT EXAMINATION

COUNSEL: Did you see him outside on the porch at the Ross Center that day?

MINOR: Yeah.

COUNSEL: Did you talk to him about your benefits?

MINOR: Yes, I was talking about that ticket-to-work thing.

COUNSEL: Was he trying to answer your questions?

MINOR: Yeah. . . .

COUNSEL: Did you see anything happen while you were talking to him?

MINOR: Well, I talked to him that first time. I was going to go deal with the unemployment office and then after I get through talking with the unemployment office, I went back to the vehicle — I called myself explaining to the unemployment office (inaudible) left it in the glove compartment and then I went back to the vehicle to get it. I'm not talking to him and then put it back in the glove compartment first, and then talked to the unemployment office without it. But then when I went to get it to take it back to the unemployment office, you know —

COUNSEL: Which is in the same building?

MINOR: The same building. . . .

COUNSEL: Were you standing on the porch when you saw this happen, talking to Mr. Kimbell?

MINOR: Well, I say I was coming from the car . . . .

COUNSEL: . . . You were coming toward Mr. Kimbell, is that correct?

MINOR: I was through talking to him and I was going to go back and let her see that ticket-to-work thing. And that's when I heard something . . . .

COUNSEL: What did you see happen then, Mr. Minor?

MINOR: I knew he was on the ground like this here (indicating). I heard something too, now. I heard his head hit like that and maybe like it knocked him unconscious or something. It was a hard fall.

. . . .

COUNSEL: How far away from him were you when he fell?

MINOR: I was coming back from the car fixin' to go back straight this way and I seen him — I think maybe I heard something, too. But if I heard somebody I heard something. Then he was laying there with his shoulders against this thing here because —

. . . .

COUNSEL: Had you just been talking to him about your benefits right before he fell?

MINOR: Well, I got through discussing about trying to get with the (inaudible) program because they said you could either go through the unemployment network . . . .

COUNSEL: Were you on the porch with him when he fell?

MINOR: No, because I'm trying to figure out —

. . . .

COUNSEL: Immediately prior to his fall you were approaching him and talking to him about your benefits, is that correct?

MINOR: We were talking about that before.

COUNSEL: What did you do after you saw him on the ground?

MINOR: I put my arm under his armpits like that and I pulled him up. . . . I said, "Hold on, let me get this chair."

. . . .

## CROSS EXAMINATION

. . . .

COUNSEL: Now you visited with Mr. Kimbell. Where was he when you were visiting with him?

MINOR: Standing right there.

. . . .

COUNSEL: Was he leaning up against the wall?

MINOR: Yeah, Yeah.

COUNSEL: You came up to him and visited with him for about how long?

MINOR: I was talking about that ticket-to-work thing and people on disability — Let's see I talked to the unemployment office and he said I could —

COUNSEL: About how long? A minute?

MINOR: I guess about five minutes, three or four minutes.

COUNSEL: Three or four minutes. And then you left here and then you went where, to the unemployment office?

MINOR: Yeah. I went on around there, yeah.

COUNSEL: And you went around to the unemployment office and then you —

MINOR: And then put the thing in my car —

COUNSEL: And then you came out to your car —

MINOR: I put that ticket-to-work thing —

COUNSEL: Okay. How far do you think you were from the door when you were at your car, approximately?

MINOR: It's probably about like 25 yards, a football field or something.

COUNSEL: Twenty-five yards?

MINOR: of a football field.

COUNSEL: And that's when you looked up and saw that he had fallen?

MINOR: Yeah, when I got near this pole here . . . . I'm thinking when I got up in here, when I got past this pole right here.

. . . .

COUNSEL: So he had fallen sometime between when you were out in the parking lot and when you were walking up to this pole, correct?

MINOR: We had done talked previously and then I —

COUNSEL: I understand. But he fell while you were walking up and this pole was in the way, wasn't it?

MINOR: Well, when I come back from my car to go back to the unemployment to let him see that ticket-to-work, let them see that a little bit — When I come through here that's when I seen him, when I come —

COUNSEL: You saw him on the ground?

MINOR: Right.

. . . .

COUNSEL: But you did not see him fall? You did not see him actually fall to the ground?

MINOR: I'm not sure. But I'm going to tell you now, I heard something — I heard the weight of his body hit the ground.

COUNSEL: How far away from him do you think you were when he fell?

MINOR: Well, I heard him — After I heard him I probably come through there and seen him and heard him — Those two poles fixing to go around this corner here.

COUNSEL: So the poles, you were at least, what 15, 10 or 15 yards away?

MINOR: Maybe that.

COUNSEL: And you say you heard him?

MINOR: Yeah.

. . . .

COUNSEL: And you were not facing him and getting in his face when he fell, is that correct?

MINOR: Oh, no, sir.

COUNSEL: So if Mr. Kimbell, in his deposition, had told me that — Let me get to them. He stepped back off of the slab because you were coming towards him, that did not happen, did it?

MINOR: No.

COUNSEL: He would be mistaken about that?

MINOR: Yeah.

COUNSEL: In fact you weren't even really there, you were coming up that way when it happened, right?

MINOR: I was finished with the conversation.

. . . .

REDIRECT EXAMINATION

COUNSEL: Mr. Minor, you just stated that when you heard him fall or saw him fall, you were approximately between these two posts right here, these two columns, is that correct?

MINOR: I seen him on the ground, yes.

COUNSEL: And you were headed in his direction, were you not?

MINOR: I was done finished with the conversation. I was going to get the — I just got through with the conversation with the unemployment office then, then I was going to get the papers out and let them see the papers.

. . . .

COUNSEL: So you were going to go right to where he was? You were headed in his direction when he fell, is that correct?

MINOR: Yes. You come through those two poles and you go down the sidewalk to enter the building, but on this side of the grass is the highway. You put your car on the road and go out to the highway.

COUNSEL: But you were headed in his direction? You were walking toward him when he fell, is that correct?

MINOR: Yeah, I was walking toward that way — From where he be standing at then I make a right turn —

COUNSEL: You were walking toward him and you were somewhere between these two poles when he fell?

MINOR: Yes, sir.

COUNSEL: Which is on the porch?

MINOR: Yes, I was out on the porch.

. . . .

RECROSS EXAMINATION

COUNSEL: I'm going to read you something out of his deposition. He is talking about you here, Mr. Minor. "I looked at the piece of paper. I tried to explain it to him. He seemed to be getting, you know, madder. So he stepped back and then I stepped back. I kept trying to keep my back away from the building. I wanted an escape route because this man was highly agitated by now. He kept talking. Question: How

many steps did you take back? Answer: Oh, I don't know, but anyway he came up to me flapping these things in my face about three times. The third time was when I fell off the porch." That did not happen, did it?

MINOR: No.

COUNSEL: You're sure about that?

MINOR: Yeah.

While Kimbell and Minor gave different versions of the circumstances surrounding Kimbell's fall, questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Patterson v. Arkansas Dep't of Health*, 343 Ark. 255, 33 S.W.3d 151 (2000). When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Id.* The Commission is not required to believe the testimony of the claimant or any other witness, but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id.* Thus, we are foreclosed from determining the credibility and weight to be accorded to each witness's testimony. *Arbaugh v. AG Processing, Inc., supra.*

Not only was the Commission entitled to give greater weight to Minor's testimony than it did to Kimbell's testimony, or that of his witnesses, but the emergency room physician's examination notes indicate that Kimbell reported having become "quite dizzy" before he fell. Furthermore, the testimony also showed that shortly after his fall, Kimbell mentioned having spoken to a man on the porch but he did not say that the man caused the accident. Because there is substantial evidence to support the Commission's decision in this case, I would affirm.

For the above-stated reasons, I respectfully dissent.

DICKEY, J., joins this dissent.