J MAR EXPRESS, INC., and Arkansas Truckers Association Self–Insurers Fund/Retention Management Services, Appellants

v.

Donald W. POTEETE (Deceased) and Death and Permanent Total Disability Trust Fund, Appellees.

No. CA 10–894.

Court of Appeals of Arkansas.

Feb. 16, 2011.

Jarrod S. Parrish, Little Rock, for appellant.

Jimmy Russell Burton, Keith L. Chrestman, Jonesboro, for appellee.

ROBERT J. GLADWIN, Judge.

This appeal follows the July 20, 2010 decision of the Arkansas Workers' Compensation Commission, affirming and adopting the opinion of the Administrative Law Judge (ALJ), which found that appellee Donald Poteete, deceased, sustained a compensable injury in the form of a heart attack, pursuant to Arkansas Code Annotated section 11–9–114 (Repl. 2002). Appellants argue that the Commission's decision is not supported by substantial evidence. We affirm.

Appellee and his wife, Jane Poteete, worked together as team drivers for appellant J Mar for over nineteen years. On June 20, 2007, the Poteetes arrived in Tracy, California, at approximately 1:30 a.m. They slept until their scheduled unloading time of 6:00 a.m., but neither participated in the unloading of the trailer. They then traveled approximately sixty miles to Santa Nella, California, took a shower, and thereafter drove 112 miles to Dinuba, California, to pick up another trailer. They hooked up to a refrigerated trailer, but the unit ceased working, and they were given another trailer. This final trailer was missing a mud flap, which had to be replaced. At that time, however, appellee just pried the flap hanger away from the tire, and they continued driving because they had no means to make the repair. Upon arriving at the truck scales, he had to pull a bar beside the axles to make the axle weights right, which took five to ten minutes.

The Poteetes then traveled two hours to Bakersfield, California. Appellee drove, and Mrs. Poteete went to sleep in the sleeper portion of the truck cab around 1:30 p.m. She was not aware of what time it was when they arrived at Bruce's Truck Stop but awoke around 3:30 p.m. At that time, she got dressed, looked out the window of the truck, and noticed emergency vehicles parked nearby. The truck was still running, but appellee was not inside. As she exited the truck, Mrs. Poteete picked up appellee's sandals and hat, which were on the ground, and removed his keys from the open sidebox door, where appellee kept tools used to work on the truck. His cloth pouch of tools was found on the ground as well.

John Cinecoe, general manager of Bruce's Truck Stop, transported Mrs. Poteete to the hospital where appellee had been transported and subsequently pronounced dead. Upon her arrival, she was required to identify appellee's body, at which time she noticed that he had "dark, red, purple-looking" burns on the back of his right arm and sides of his torso.

At the hearing before the ALJ, Mrs. Poteete testified that she did not go with appellee to purchase a new mud flap, but at the time she was leaving for the hospital, she noticed that one had been installed on the trailer. Prior to that day, appellee had never before had to replace a mud flap by himself. He previously had aided another driver in that task, but the weather on that occasion was cool. The temperature in Bakersfield, California, at the time of the incident, however, was 106 degrees Fahrenheit. Although Mrs. Poteete did not see appellee change the mud flap the day he died, she concluded that he installed the mud flap based on the fact that she saw the new flap installed and found a receipt for its purchase in his wallet.[1]

1. Claimant's Exhibit 2 at the hearing before the ALJ was comprised of a J Mar Payroll Driver Settlement Report for Mrs. Poteete dated June 25, 2007, and a payroll stub for her for the period ending June 25, 2007. The settlement report reflects, inter alia, that she

Mrs. Poteete had never changed a mud flap, but she explained that she had observed the task. She described that replacing a flap requires the loosening/removal of four to six bolts, inserting the approximately twenty-pound flap, and replacing/tightening the bolts. She noted that appellee had only manual tools, while replacing a mud flap typically requires the use of air-powered ones. She indicated that the task is normally performed by garage mechanics and takes from thirty to forty-five minutes to perform. While acknowledging that J Mar would have reimbursed them for the repair if someone had charged them, Mrs. Poteete indicated that there were very few garages in the area and that Bruce's Truck Stop did not have a repair shop.

¶4Deposition testimony was presented from general manager Cinecoe. He described the facility as a multi-unit one, comprised of a restaurant, bar, convenience store, fueling system, and provider of trucking services, including parking. He explained that Idle Aire Technologies (Idle Aire) contracts with the truck stop to place air-conditioning equipment on the property. According to Cinecoe, an employee of Idle Aire, Lou Orozco, informed him that he saw appellee lying on the ground between his tractor and trailer. When Cinecoe reached the scene, police, fire, and ambulance personnel were present, but Mrs. Poteete did not appear until the ambulance was leaving, at which time he gave her a ride to the hospital.

Orozco's deposition testimony indicated that he is a maintenance technician for Idle Aire. On June 20, 2007, he was at Bruce's Truck Stop, fixing an HVAC unit on a man-lift ten to twenty feet off the ground. After another employee told him that he saw a man fall to the ground, Orozco turned around and saw appellee. He was on the driver's side of the truck and appeared to be attempting to get into a side compartment. Orozco stated that "[h]e looked like he had fell [sic], and . . . guess[ed] the asphalt was so hot that it looked like it was like burning his hands, and he was like jumping up and flopping all over the place." Orozco lowered the lift and called 911. He described appellee's skin as being so burned that a portion of it remained stuck to the pavement after he was moved. In addition, appellee's eyes were red and "white stuff" was coming from his mouth. Orozco indicated that "it was so hot out here," and the area where the truck was located had no shade with the sun blazing on it.

¶5Martin Camarena's October 24, 2008 deposition testimony indicated that he was working as a field-service technician for Idle Aire at Bruce's Truck Stop on June 20, 2007, and that he also saw appellee that day. He had been working next to appellee's truck on the equipment provided for the truck drivers for approximately thirty minutes prior to appellee coming out of the truck and collapsing. He saw appellee step out of his truck, which caught Camarena's attention because appellee was only wearing some type of boxer shorts[2] with no shirt or shoes on a very hot day. He observed appellee go over to the side of his cab and open a compartment where tools are kept. When appellee reached his hands in, Camarena saw him stumble backward and fall to the ground.

Camarena stated that the fall took place no more than one minute after appellee got out of his truck. He described appel-

---

was reimbursed $11.79 on June 25, 2007, for "Tractor/Trailer Parts," presumably for the new mud flap.

2. The autopsy report indicates that appellee was clad in white briefs and camouflaged shorts.

lee as "turning black and purple," and struggling to breathe. After calling 911, Orozco and Camarena turned appellee over and noticed burns on his back and legs from the hot pavement.

Camarena's testimony indicated that, at some point prior to his collapse, appellee went to the truck-stop office and asked if he could borrow some tools. The supervisor did not have tools to loan, and informed appellee that it was dangerous for him to be walking around barefoot because the ground was extremely hot. Camarena stated that, at the time the alleged incident took place, appellee's truck was idling and that no Idle Aire system was attached to it. Camarena acknowledged that if appellee had been outside working on a mud flap more than thirty minutes prior to collapsing, he would not have seen that occur.

Mrs. Poteete stated that the air conditioning in the truck was operating the day appellee died. She did not notice anything unusual about his appearance. Her testimony was that she could not state how long it took him to change the mud flap or how many times he went in and out of the truck prior to collapsing because she was asleep.

With respect to appellee's physical condition, evidence indicated that he underwent a Department of Transportation (DOT) physical in the office of J Mar's company doctor, Dr. Joseph, in Searcy, Arkansas, in February 2007. He passed it as well as all of his previous DOT physical examinations. Appellee was required to undergo an annual physical because he took Diovan to treat hypertension. He had been taking the same dosage of medication for five-to-six years prior to his death, and evidence indicated that this condition was under control. The DOT physical did not note him to be overweight, despite the fact that it reflected that appellee was 5'11" and 292 pounds.

Other than urological surgery, appellee never underwent any major surgery. He had never had a heart attack or stroke, experienced a loss of consciousness, or was referred for any cardiac testing or treatment. He ceased smoking and alcohol consumption in 1999, after experiencing a religious conversion.

His April 2009 physical indicated his weight to be 292 pounds and noted that he had a history of yo-yo dieting that caused his weight to fluctuate. Notwithstanding this finding, appellee was able to purchase $100,000 in life insurance two months after the physical.

The medical records of Kern Medical Center in Bakersfield, California, reflect that appellee was found unresponsive outside the truck stop on June 20, 2007. Upon arrival at the scene, paramedics discovered that he had no pulse, and CPR was administered. During transportation to the hospital, appellee was given two rounds of atropine and epinephrine, and defibrillated five times, without success. Upon arrival at the hospital, CPR was continued, and he was intubated. At that point, he had lacked vital signs in excess of twenty minutes. He was noted to have "second-degree burns on his abdomen and trunk due to lying on the tar in the hot sun." CPR was continued for another two minutes, without success, and he was given another dose of atropine and epinephrine. No shockable rhythm was discovered. CPR was continued for two more minutes and then ended. At this point, his downtime was estimated to have been from forty to forty-five minutes. He was declared dead at 3:18 p.m.

The clinical impression by Dr. Imrun Imam, resident physician, and signed off on by Dr. Adria Winter, was that appellee suffered cardiopulmonary arrest. Appel-

lee's death certificate lists his cause of death as "Hypertensive and Arteriosclerotic Cardiovascular Disease," and lists "History of Heat Exposure (Hyperthermia)" as another condition that contributed to his death.

The August 28, 2007 autopsy report lists the following pathological diagnoses: (1) Arteriosclerotic Cardiovascular Disease; (2) Cardiomegaly; (3) Hepatosplenomegaly; (4) First and Second Degree Burns (History of Heat Exposure); (5) Obesity. Appellee's body was noted to have first- and second-degree burns on the chest, abdomen, shoulders, and elbows. Examination showed a ninety-five percent narrowing of the left anterior descending artery, and forty- to fifty-percent narrowing of the right coronary artery and left circumflex. Duc Van Duong, M.D., forensic pathologist, cited the cause of death as "Hypertensive and Arteriosclerotic Cardiovascular Disease," with "History of Heat Exposure (Hyperthermia)" given as another condition. Toxicology tests on June 21, 2007, showed no drugs in appellee's system. Appellee's death was ruled an accident.

On April 9, 2010, the ALJ issued his opinion in favor of appellee. Appellants filed a timely appeal with the Commission, and the Commission affirmed and adopted the ALJ's opinion on July 20, 2010. Appellants filed a timely notice of appeal on July 30, 2010.

In appeals involving claims for workers' compensation, this court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *See Kimbell v. Ass'n of Rehab Indus. & Bus. Companion Prop. & Cas.*, 366 Ark. 297, 235 S.W.3d 499 (2006). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* The issue is not whether the appellate court might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, the appellate court must affirm the decision. *Id.* We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Dorris v. Townsends of Ark., Inc.*, 93 Ark.App. 208, 218 S.W.3d 351 (2005).

Questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Drywall v. Carey*, 2009 Ark. App. 749, 352 S.W.3d 334. When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Id.* The Commission is not required to believe the testimony of appellee or any other witness, but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id.* Thus, we are foreclosed from determining the credibility and weight to be accorded to each witness's testimony. *Arbaugh v. AG Processing, Inc.*, 360 Ark. 491, 202 S.W.3d 519 (2005).

The issue of compensability is controlled by the provisions of Arkansas Code Annotated section 11–9–114 (Supp.2009), and the standard of proof in heart attack cases is high, as follows:

(a) A cardiovascular, coronary, pulmonary, respiratory, or cerebrovascular accident or myocardial infarction causing injury, illness, or death is a compensable injury only if, in relation to other factors contributing to the physical harm, an

accident is the major cause of the physical harm.

(b)(1) An injury or disease included in subsection (a) of this section shall not be deemed to be a compensable injury unless it is shown that the exertion of the work necessary to precipitate the disability or death was extraordinary and unusual in comparison to the [10]employee's usual work in the course of the employee's regular employment or, alternately, that some unusual and unpredicted incident occurred which is found to have been the major cause of the physical harm.

(2) Stress, physical or mental, shall not be considered in determining whether the employee or claimant has met his or her burden of proof.

Subsection (a) requires that the relation to all factors contributing to the ultimate physical harm and "accident" must be the major cause of the physical harm. Subsection (b) focuses on the circumstances surrounding the incident and requires that the exertion of the work necessary to precipitate the disability or death must be extraordinary and unusual in comparison to the employee's usual work in the course of the employee's regular employment or, alternatively, that some unusual and unpredicted incident occurred that was the major cause of the physical harm.

■ Appellants first argue that the Commission's decision is impermissibly based on speculation and conjecture because no evidence was presented that established what actually transpired before appellee collapsed and passed away. This court has unequivocally stated that the Commission is not permitted to base its decision on speculation and conjecture. *Evans v. Bemis Co.*, 2010 Ark. App. 65, 374 S.W.3d 51. A claim for workers' compensation benefits must be based on proof.

*Clark v. San Antonio Shoes, Inc.*, 2009 Ark. App. 689, 2009 WL 4654822.

Appellants submit that the Commission basically filled in the gaps in appellee's proof by speculating about what likely happened outside of his tractor trailer at the truck stop. They argue that the record does not contain any proof that appellee performed strenuous job duties or that he exerted himself over and above what he would do normally in his job as an over-the-road[11] truck driver. The only witnesses who provided testimony regarding appellee's activities prior to his death— Camarena and Orozco—indicated that he had not been outside of the truck during the half-hour time period prior to collapsing and that he had only been out of his truck for less than a minute before suffering a heart attack.

■ We disagree. In *Olsten Kimberly Quality Care v. Pettey*, 328 Ark. 381, 944 S.W.2d 524 (1997), our supreme court noted that evidence and all reasonable inferences are viewed in a light most favorable to the Commission's findings. This court will not re-weigh the evidence and replace the Commission's findings regarding the witnesses' credibility findings of fact, which is not our role. *Arbaugh, supra.* The issue is not whether the evidence supports a different finding, *see Minnesota Mining & Mfg. v. Baker*, 337 Ark. 94, 989 S.W.2d 151 (1999), but is whether substantial evidence supports the Commission's findings. Ark.Code Ann. § 11–9–711(b)(4) (Supp.2009). Because fair-minded persons could reach the Commission's decision, we must affirm. *Pettey, supra.*

■ The Workers' Compensation law provides that a death-resulting heart attack is compensable when extraordinary and unusual work-related activity is the injury's majority cause, which means more than fifty percent of the cause. Ark.Code

Ann. § 11–9–102(14)(A) (Repl.2002); *see also Huffy Serv. First v. Ledbetter,* 76 Ark.App. 533, 69 S.W.3d 449 (2002). While it is true that conjecture and speculation cannot take the place of credible evidence, it is equally true that the Commission has the right to consider all circumstances and proven facts and to draw all reasonable inferences deducible therefrom. *See Wilson v. United Auto Workers,* $|_{12}$246 Ark. 1158, 441 S.W.2d 475 (1969). We have said that circumstantial evidence is sufficient to support an award, and it may be based upon the reasonable inferences that arise from the reasonable probabilities flowing from the evidence; neither absolute certainty nor demonstration is required. *See Franklin Collier Farms v. Bullard,* 33 Ark.App. 33, 800 S.W.2d 438 (1990). We hold that whatever facts not proved by direct evidence were reasonably inferred and based on the admitted proof.

It is undisputed that there was no garage at the truck stop. Evidence indicates that the new mud flap was installed on appellee's truck, although no one saw who installed the new mud flap. The ALJ, and later the Commission, found that appellee installed the mud flap. On June 20, 2007, after appellee and Mrs. Poteete arrived at the truck stop, while she slept, he purchased a new mud flap. The $11.79 mudflap purchase was evidenced by J Mar's settlement report. Again, there was no garage on site, but evidence indicates that appellee tried to borrow some tools from a supervisor on duty.

At some point after the new mud flap was installed, appellee collapsed on the hot pavement, sustaining severe burns to his body from the asphalt. Nearby workers tried to help, but when they tried to move appellee's body, his skin peeled off. Mrs. Poteete awoke and found emergency vehicles outside her truck. She got out of the truck; picked up appellee's flip-flops, tool pouch, shirt, and hat; and pulled his hanging keys out of the side storage-box lock. As she left to follow appellee to the hospital, she noticed the trailer's newly installed mud flap. Given this admitted evidence, and even though appellants argue appellee could not have $|_{13}$installed the new mud flap because of Camarena's testimony that appellee collapsed one minute after stepping out of his truck, it was reasonable to infer that appellee installed the new mud flap because Camarena also acknowledged that it was possible that appellee finished installing the new mud flap more than thirty minutes prior to his collapse, and that he would not have seen him if that had occurred. Given that heat exposure contributed to appellee's cause of death, this theory is a more logical inference than appellants' contention that the brief one-minute period outside caused appellee's heart attack.

Appellants also argue that appellee failed to establish that his work activities were the major cause of the heart attack he suffered and that he failed to establish that he was engaged in work activities that required exertion so extraordinary and unusual that they can be deemed to be the cause of his passing as required by section 11–9–114. Appellants further contend that the Commission's finding that the major cause of appellee's massive heart attack was some unspecified, unproven job activity is even more problematic given the evidence indicating that appellee suffered from serious heart problems prior to the date of his death. They note specifically Mrs. Poteete's testimony that appellee was a yo-yo dieter who was overweight at the time of his passing.

It is undisputed that appellee suffered from high blood pressure that required him to take Diovan regularly for five-to-six years before his death. Mrs. Poteete

could not state for certain that appellee had actually taken his medication on the day that he passed away. The doctors who attempted to revive appellee at the hospital initially noted his chief complaint to be "full arrest." Later, after pronouncing appellee dead, the emergency-room physicians opined that he had suffered a "cardiopulmonary event," and they referenced "cardiopulmonary arrest" in the report wherein appellee was pronounced dead.

Additionally, the medical examiner who performed appellee's autopsy found the following:

> The 540 gram heart occupies its usual mediastinal site. The external configuration appears enlarged. The epicardial surfaces are smooth and glistening with moderate amounts of adipose tissue.... The coronary arteries arise normally and are distributed in a left dominant distribution with 95% atherosclerotic narrowing of the proximal left anterior descending coronary artery. The right coronary artery and the left circumflex reveal approximately 40–50% of narrowing.
>
> The myocardium is firm, red-brown with areas of fibrosis at the septum and the left ventricle measuring 3 × 2 cm is 3 cm from the apex....

Based on these findings, the medical examiner signed a death certificate stating that the "Cause of Death" was "Hypertensive and Arteriosclerotic Cardiovascular Disease." In the section of the death certificate requesting the "interval between onset and death," appellants note that the examiner opined that the problem had been present for "*years.*"

Appellants maintain that the major cause of appellee's death was the extensive arteriosclerotic narrowing in his descending coronary arteries, his preexisting hypertension, and his obesity. Appellants maintain that the fleeting mention of "hyperthermia by history" in the coroner's report·is insufficient to establish the major-cause element.

We note that appellee had no medical history of heart problems. It is undisputed that he had recently passed physical evaluations for both DOT and a life-insurance application. The Commission found that exposure to heat while installing a new mud flap was the major cause of appellee's heart attack and death despite appellants' offer of an alternative cause of a narrow coronary artery. This court has held that prior heart conditions do not preclude a major-cause finding. *City of Blytheville v. McCormick,* 56 Ark.App. 149, 939 S.W.2d 855 (1997). Additionally, we hold that substantial evidence supports the Commission's finding that but for appellee's heat exposure on that day, he had suffered no heart problems, as indicated by the following: (1) He never underwent heart surgery; (2) He never underwent a heart stint or heart cath; (3) He never was hospitalized because of his heart; (4) In the last five-to-ten years, he had never been referred to a cardiologist or for a cardiac work-up; (5) He never suffered a stroke; (6) He never lost consciousness or passed out; (7) Two months prior to his death, he underwent and passed a physical as a part of a life-insurance application; (8) Four months prior to his death, he underwent and passed his annual DOT physical; (9) Both the life insurance and DOT physicals included physical activity and an examination of his heart and breathing; (10) The autopsy report and death certificate concluded that appellee's death was an accident and the result of heat exposure.

Arkansas Code Annotated section 11–9–114(a) states that a heart attack is compensable if, in relation to other factors contributing to the physical harm, an accident is the major cause of the physical harm.

Here, the medical evidence indicates that appellee's exertion in the extreme environmental conditions present on the day of the incident was the major cause of his heart attack. Despite any preexisting propensities for such an event, appellee had previously performed his job duties without restrictions related thereto and was able to report to work each day and perform his duties.

With respect to those preexisting conditions, appellants improperly assert that, because there was medical evidence that might have supported a contrary conclusion, the Commission improperly weighed the medical evidence. The mere fact that there was evidence supporting a contrary finding does not allow this court to reverse the Commission's resolution of conflicting medical evidence. A person who has predisposing factors may yet suffer a heart attack that is caused by something other than those predisposing factors, and the existence of predisposing factors is merely causal evidence for the Commission to assess. *See Drywall v. Carey, supra.*

The term "extraordinary and unusual" does not require the causal activities to be entirely different from any type of employment activities that the claimant may have previously performed. *See Huffy, supra.* In this case, we note that appellee had been employed by J Mar for many years. Although he had previously assisted, on a single occasion, with changing a mud flap, he had not been required to perform those duties in as hot an environment as that present on the day in question. Additionally, evidence before us allows for the inference that he replaced it alone with less than ideal tools for the job.

Despite appellants' argument to the contrary, we hold that the ALJ, and subsequently the Commission, analyzed all of the evidence regarding the details of the activities and environment on the day in question and adequately explained why the events were extraordinary and unusual. The determination of whether the events were unusual and extraordinary was a factual one for the Commission to make, and reasonable minds could determine that the heart attack was the primary cause of appellee's death. Substantial evidence exists to support the Commission's finding of compensability related to appellee's heart attack.

Affirmed.

VAUGHT, C.J., and MARTIN, J., agree.