Kenneth S. Hixson, Judge, dissenting.
Once a workers' compensation claim is controverted, it is an adversarial proceeding. As such, the legislature has defined the essential elements to be proven and set forth the burden of proof required. To prove the occurrence of a specific-incident compensable injury, the claimant must establish that (1) an injury occurred arising out of and in the scope of employment ; (2) the injury caused internal or external harm to the body that required medical services or resulted in disability or death; (3) the injury is established by medical evidence supported by objective findings as defined in Arkansas Code Annotated section 11-9-102(16) ; and (4) the injury was caused by a specific incident and is identifiable by time and place of occurrence. Ark. Code Ann. § 11-9-102(4)(A)(i)
*383 (Repl. 2012). Section 11-9-102(16) defines objective findings as findings that cannot come under the voluntary control of the patient. Moreover, the statute provides that neither complaints of pain nor range-of-motion tests shall be considered objective medical findings. Id. The claimant has the burden of proving these elements by a preponderance of the evidence. Ark. Code Ann. § 11-9-102(4).
It is the first and fourth elements of section 11-9-102(16) that are of particular interest in this case. Clearly, the record indicates that the appellee Coffman was at work and fell on his left shoulder, causing pain and, perhaps, even a limitation in his range of motion. However, the question is whether this fall is a "compensable injury" as contemplated by the workers'-compensation statute. The terms "accident" and "injury" are neither synonymous, nor interchangeable. Did Coffman have an accident at work? He did. But, did Coffman sustain a compensable injury at work? That is the narrow inquiry here.
To establish a compensable work injury, a worker must prove, inter alia , that the alleged injury arose out of and in the scope of employment, and that the injury was caused by a specific incident identifiable by time and place of occurrence. Therefore, the first threshold question is "what was the injury ?" Without repeating the medicalese in the radiologist's report, the objective medical evidence in this case established that Coffman's injury was undeniably a torn rotator cuff. The next narrow question is whether the worker's torn rotator cuff (the injury) arose out of and in the scope of employment. The focus should not be on whether the fall, resulting pain, and limited range of motion arose out of and in the scope of employment. The focus must be on whether sufficient evidence exists in the record that the rotator cuff tear (the alleged compensable injury) arose out of and in the scope of employment.
Coffman visited his primary-care physician shortly after the "accident." His primary-care physician diagnosed a left shoulder sprain and subsequently referred Coffman to an orthopedic surgeon. This orthopedic surgeon, Dr. Jason Stewart, was familiar with Coffman. Five years earlier, Coffman had presented to Dr. Stewart with right shoulder pain. Dr. Stewart diagnosed a right rotator-cuff tear and performed a reverse total shoulder arthroplasty. Now, five years later and a couple of weeks after Coffman fell, an MRI was performed on his left shoulder. After reviewing the MRI, Dr. Stewart reported:
This is similar to the opposite shoulder [Coffman's right shoulder] that required reverse total shoulder arthroplasty 5 years ago. These findings, with retraction and atrophy to this degree, do not correlate with an injury that occurred on April 6, 2017. These are very old, chronic problems , and to fix this a reverse shoulder arthroplasty is needed, just like the opposite side needed 5 years ago. I talked to him about treatment options. He is ready to do something about it.
(Emphasis added.)
Thereafter, the workers'-compensation carrier evidently did not approve the reverse total shoulder arthroplasty on the left shoulder. Naturally, Coffman went back to Dr. Stewart and apparently asked the doctor point blank, "When did the torn rotator cuff occur?" Dr. Stewart's notes provide the clear answer:
Again, he asked about the age of the tear and the indicators show marked atrophy of the muscles of the rotator cuff, with retraction of 5 cm. I have reviewed his MRI again . I reviewed his old notes from when I took care of him for his opposite shoulder and those showed *384 very similar findings. He reported an injury shortly before he came to see me about his opposite shoulder, but the MRI itself showed chronic changes of an elevated humeral head and chronic changes of rotator cuff tear arthropathy. The changes that are seen on both the radiographs and the MRI are all indicative of a chronic problem, and a cuff tear that has been present for many months, if not years, to see the changes that we see happening on his imaging studies. This is not something that is amenable to a more simple surgery such as a rotator cuff repair. I still believe that the best surgical procedure for him would be similar to what we did on the opposite side with a reverse total shoulder arthroplasty. For now, since they will not approve that, I have at least recommended physical therapy to see if we can get him back to where his baseline was, to where he is [at] least not having any problems with the shoulder, even though it was abnormal radiographically and by imaging studies. I told him that it is possible to successfully live with a cuff-deficient shoulder, and some people do for many years. Unfortunately, they do come in here with changes indicative of chronic problems that they have just been able to successfully ignore for quite some time, which I think is what was happening with his shoulder. He already has a lawyer and is discussing the case with him, and does not want to start physical therapy yet until talking to his lawyer. He does not want to consider any other options until he talks to his lawyer. I will leave his appointment open and let him get back with us when he knows what he wants to do about his arm.
(Emphasis added.) In summary, Coffman's orthopedic surgeon went back and reviewed the MRI a second time to make sure of his diagnosis and the cause of the tear. And Dr. Stewart opined for the second time that, based on the x-rays and the MRI, Coffman's rotator cuff had been torn "for many months, if not years." Dr. Stewart noted that the muscles around the rotator cuff showed "marked atrophy" and that the muscles have retracted, or pulled away, by a distance of 5 centimeters from the joint, which indicates a chronic condition.
Back to our legal inquiry: (1) Did the injury (the torn rotator cuff) that Coffman suffered arise out of and in the scope of employment? The only medical evidence in the record from a qualified orthopedic surgeon is an emphatic "no." The torn rotator cuff was not caused by the fall Coffman had a few weeks earlier on April 6, 2017; instead, the torn rotator cuff had existed for many months, if not years. Therefore, Coffman failed to prove by a preponderance of the objective medical evidence that his injury arose out of and in the scope of employment.
Coffman also failed to prove the fourth essential element. Recall that element is whether the injury (the torn rotator cuff) was caused by a specific incident whose occurrence is identifiable by time and place? That answer is also "no." Dr. Stewart unequivocally reported that Coffman's rotator cuff was torn "many months, if not years" ago and that it was not caused by the fall at work on April 6, 2017. Therefore, Coffman failed to prove his alleged injury was caused by a specific incident identifiable by time and place of occurrence. Coffman failed to prove at least two essential elements of his claim by a preponderance of the evidence.
The majority here contends that the Commission had carte blanche to disregard an orthopedic surgeon's opinion and that we, as a reviewing court, must simply accept the Commission's conclusion. I disagree.
*385 I acknowledge that the Commission has the authority to accept or reject medical opinions, and its resolution of the medical evidence has the force and effect of a jury verdict. Diggs v. Cattlemen's Livestock Mkt., Inc. , 2009 Ark. App. 249, 306 S.W.3d 20 ; Poulan Weed Eater v. Marshall , 79 Ark. App. 129, 84 S.W.3d 878 (2002). I also acknowledge that, when there are conflicts in the evidence, the Commission can reconcile the conflicting evidence and determine the facts; however, the Commission may not arbitrarily disregard medical evidence or the testimony of any witness. Rice v. Boyd Metals , 2015 Ark. App. 443, 468 S.W.3d 297. Our supreme court has previously defined "arbitrary" as a "decisive but unreasoned action." City of Lowell v. M & N Mobile Home Park, Inc. , 323 Ark. 332, 339, 916 S.W.2d 95, 98 (1996) (emphasis added). Further, in other agency decisions, our supreme court has stated, "To be invalid as arbitrary or capricious requires that the agency's decision lacks a rational basis or relies on a finding of fact based on an erroneous view of the law." Pine Bluff for Safe Disposal v. Ark. Pollution Control & Ecology Comm'n , 354 Ark. 563, 573, 127 S.W.3d 509, 516 (2003) (emphasis added). While the Commission's decisions are insulated to a significant degree by a deferential standard of review, its decisions are not beyond a meaningful appellate review. Kimbell v. Ass'n of Rehab Indus. & Bus. Companion Prop. & Cas. , 366 Ark. 297, 304, 235 S.W.3d 499, 505 (2006). Here, the Commission's decision to disregard the medical opinion of Dr. Stewart was arbitrary, improper, and in error.
To determine whether the Commission's decision to disregard Dr. Stewart's opinion is arbitrary, we need only look to the Commission's own conclusion:
The evidence demonstrates that these objective medical findings [the abnormalities showing the rotator cuff tear on the MRI] were causally related to the April 6, 2017 accidental injury and were not the result of a prior injury or pre-existing condition.
The Commission's conclusion is made of whole cloth and entirely contradicted by the only medical evidence in the record. The Commission disregarded Dr. Stewart's testimony entirely with only the following reason given:
The Full Commission in the present matter rejects Dr. Stewart's opinion that the claimant's objective medical findings "do not correlate with an injury that occurred on April 6, 2017." To the contrary, none of the tears in the tendon of the claimant's left shoulder were shown to be present before the stipulated April 6, 2017 accidental injury. In order to conclude that these demonstrated post-injury abnormalities were simply degenerative and not related to the stipulated accident occurring April 6, 2017, the Full Commission would have to resort to conjecture and speculation. Conjecture and speculation can never supply the place of proof.
So, let us get this straight. A licensed, accredited orthopedic surgeon-the surgeon who would actually operate on Coffman's shoulder-read and reviewed the actual x-rays and actual MRI films not once, but twice, in real time. And the same treating surgeon determined that the objective medical findings (i.e., the condition of the humerus, the muscle atrophy, the pulling away of muscle to 5 centimeters, etc.) did not correlate with an injury that occurred on April 6, 2017. Instead, he stated that those medical findings correlate to a torn rotator cuff that took months or years in the making. However, the Commission, who read an MRI report seven days shy of two years later, disagrees with the surgeon who reviewed the actual films *386 in preparation for surgery. Why did the Commission disagree? Because it "would have to resort to conjecture and speculation" to determine that the torn rotator cuff was not related to the fall on April 6, 2017. That is not a rational conclusion. Its decision meets the legal and practical definitions of arbitrary.
The Commission's statement that the injury must be compensable merely because "none of the tears in the tendon of the claimant's left shoulder were shown to be present before the stipulated April 6, 2017 accidental injury" is equally untenable. Just because there were no radiographs taken of the tear before the fall, does not necessarily mean that the tear must have happened during the fall. This cannot be the law; and, is not the law. Res ipsa loquitur has no place in this workers'-compensation case. We should not render medical opinions given to a reasonable degree of medical certainty of no use and disregard them because we do not agree with them. Seldom, if ever, are there baseline radiographs to show the existence of a previous medical condition; but the absence of baseline radiographs cannot and does not make all injuries compensable. The logical conclusion of the Commission's reasoning is this: The x-rays showed an injury; ergo, the injury must have occurred during the fall. That is an impermissible conclusion for the Commission to draw.
It is not uncommon for a physician to discover an unrelated injury or condition when treating a person for another injury or medical condition. For example, upon reviewing x-rays or an MRI, a physician, while treating a person who suffered from broken or cracked ribs after a fall, could also discover a tumor or cancer near the crack or fracture. Surely, no one would suggest that the tumor or cancer was caused by the fall. The same is true here. Coffman fell and, according to his primary-care physician, sustained a sprained left shoulder. X-rays and MRIs taken after the fall revealed that Coffman also suffered from a torn rotator cuff that was months or years in the making. What clouds the issue herein is that the "left shoulder injuries" sound similar. Are they the same? That is why the expert medical opinion of the orthopedic surgeon is critical in this case and cannot be arbitrarily disregarded. When Coffman presented to Dr. Stewart, the surgeon reviewed those radiographs twice and unambiguously reported that the need for the shoulder surgery was caused by the torn rotator cuff that took months or years to develop and not the sprain or whatever injury Coffman sustained as a result of the fall that occurred two weeks earlier.
Here, the Commission arbitrarily disregarded the evidence just as it did in Freeman v. Con-Agra Frozen Foods , 344 Ark. 296, 40 S.W.3d 760 (2001) (reversing a denial of benefits when the Commission arbitrarily failed to give credence to Dr. Jones's opinion that the claimant's carpal tunnel syndrome was caused by her job), and Prock v. Bull Shoals Boat Landing , 2014 Ark. 93, 431 S.W.3d 858 (reversing a denial of benefits where the Commission arbitrarily disregarded any testimony that supported the claimant's claim). The issue in this case is not one of conflicting medical evidence that needed to be reconciled by the Commission. There is no conflicting medical evidence. To that end, this is not the typical case before us in which the Commission simply weighed or credited one doctor's opinion over another. See Stoker v. Thomas Randal Fowler, Inc. , 2017 Ark. App. 594, 533 S.W.3d 596. Instead, the only relevant medical evidence and opinion regarding causation was given by appellee's own physician. Each of the two times Dr. Stewart noted that he reviewed the MRI, he drew the same conclusion-the *387 findings in the MRI were "all indicative of a chronic problem" and did "not correlate with an injury that occurred on April 6, 2017." Rather than considering the only medical opinion offered, the Commission arbitrarily disregarded this medical evidence and instead concluded: the injuries were "degenerative and not related to the stipulated accident occurring April 6, 2017, the Full Commission would have to resort to conjecture and speculation." Dr. Stewart did not speculate or have to resort to conjecture. Twice he opined that the damage to Coffman's shoulder was not caused by the recent fall but was due to an old, chronic injury. The only shortfall in this case is the Commission's decision to arbitrarily disregarded Dr. Stewart's medical opinion. I would reverse the Commission's decision because I am convinced that fair-minded persons with the same facts before them could not have reached the Commission's conclusions.
Virden and Brown, JJ., join in this dissent.